**UNITED STATES FIDELITY & GUARANTY COMPANY,**
Plaintiff,

v.

**LEE INVESTMENTS LLC dba the Island, Defendant.**

No. CV–F–99–5583 OWW/SMS.

United States District Court,
E.D. California.

March 18, 2008.

Bruce Tabor Smyth, Alan Howard Lazar, Charlston, Revich & Chamberlin LLP, Los Angeles, CA, for Plaintiff.

Daniel Oliver Jamison, David John Weiland, Keith M. White, Dowling, Aaron & Keeler, Fresno, CA, for Defendant.

MEMORANDUM DECISION GRANTING IN PART AND DENYING IN PART LEE INVESTMENTS LLC'S MOTION TO VACATE PARTIAL JUDGMENT ON JURY VERDICT UPON MULTIPLE CLAIMS INVOLVING MULTIPLE PARTIES OR TO ALTER OR AMEND PARTIAL JUDGMENT PURSUANT TO RULES 59(e) and 60(a) & (b), FEDERAL RULES OF CIVIL PROCEDURE (Doc. 704)

OLIVER W. WANGER, District Judge.

Lee Investments LLC (hereafter Lee) moves for an Order vacating the "Partial Judgment on Jury's Verdicts Upon Multiple Claims Involving Multiple Parties" (hereafter Partial Judgment), (Doc. 681), entered on March 1, 2007 in favor of United States Fidelity & Guaranty Company (hereafter USF & G), American Specialty Insurance Services, Inc. (hereafter American Specialty or ASI), and Aon Risk Services Inc. of Central California Risk Services (hereafter Aon).

The Partial Judgment states:

This case was tried before a jury commencing January 29, 2007, and concluded upon the return, by the jury, of its verdicts on February 26, 2007. The case involves more than one claim for relief, including counter-claims and third-party claims and involved multiple parties. The parties have reserved, by written stipulation and order: USF & G's alter ego claims against Richard K. Ehrlich, an individual, et al., the determination of the amount of attorneys' fees and interest claimed by USF & G; and the claim of Aon Risk Services Inc. of Central California Insurance Services ("Aon") for relief based on the tort of

another. All other claims of the parties were adjudicated by the jury, including USF & G's claim for rescission based on fraud; all claims of Lee Investments LLC, dba The Island, a California limited liability company. Any claims as to Diane Conley have been determined by the parties' stipulation.

Due to the prior delay in, complexity and contentiousness of this litigation, to avoid uncertainty and inconsistent verdicts, there is no just reason for delay and partial judgment should now therefore be entered.

Based on the jury's written verdicts returned in open court February 26, 2007, the following verdicts were rendered:

A. The jury's verdicts finding in favor of USF & G on its claim for rescission finding fraud and intentional concealment; finding against Lee on all Lee's defenses of statutory waiver, common law waiver, estoppel, unreasonable delay, wrongful conduct, and awarding USF & G restitution damages in the amount of $875,034.99.

B. On Lee's claims against USF & G, American Specialty and Aon, finding in favor of USF & G, American Specialty, and Aon and against Lee on all Lee's claims for fraud/intentional misrepresentation; concealment; conspiracy; negligent misrepresentation; and negligence. Finding against Lee and in favor of Aon on Lee's claim for breach of an oral contract against Aon. Finding in favor of USF & G, American Specialty and Aon and against Lee on all their defenses to Lee's claims based on fraud of Lee; negligent misrepresentation by Lee; estoppel against Lee; wrongful conduct by Lee; common law waiver against Lee; as to Aon against Lee due to Lee's intentional tort as superseding cause; as to Aon, no unreasonable delay by Lee; and in favor of Aon and against Lee on Aon's defense of assumption of risk.

C. On all Aon's claims against Lee, finding in favor of Aon and against Lee on Aon's claims for intentional misrepresentation, negligent misrepresentation and that Lee was 100% comparatively at fault; in favor of Aon's claim of negligence against Lee; that Aon was not negligent. Finding in favor of Aon and against Lee on all Lee's affirmative defenses to Aon's claims, including fraud, negligent misrepresentation, estoppel, no wrongful conduct by Aon; no common law waiver by Aon, no unreasonable delay by Aon.

Accordingly, on each of these claims and defenses, JUDGMENT IS ENTERED AS FOLLOWS:

1. In favor of USF & G and against Lee for rescission and USF & G shall recover from Lee restitutionary damages of $875,034.99;

2. Against Lee on all Lee's defenses to USF & G'S claims for rescission;

3. Against Lee on all its claims and in favor of USF & G, American Specialty and Aon against Lee and in favor of USF & G, American Specialty and Aon on all their affirmative defenses to Lee's claims;

4. In favor of Aon on all its claims and against Lee; and against Lee in favor of Aon on all on [sic] Lee's affirmative defenses to Aon's claims; and

5. USF & G, American Specialty and Aon shall recover costs of suit.

Lee moves pursuant to Rules 59(e) and 60(a) and (b), Federal Rules of Civil Procedure, asserting as grounds:

1. The Partial Judgment is void in that the California Workers' Compensation Appeals Board (WCAB) has and had exclusive jurisdiction;

2. The Court committed clear error and its decisions have been manifestly unjust in denying Lee judgment as a

matter of law on USF & G'S original and amended complaint for rescission in that:

 a. This Court does not have jurisdiction and the complaint fails to state a claim upon which relief can be granted;

 b. California law does not permit a workers' compensation insurer to impose a condition or expectation on a workers' compensation policy except by endorsement to the policy and then the insurer may only terminate the policy in accordance with its cancellation provisions;

 c. As a condition or exception to Lee's workers' compensation policy, Matthew Sackett's August 11, 1998 facsimile to William Hildebrand was required to be, but was not, clear plain and conspicuous;

 d. Christy Platt's August 12, 1998 letter to Matthew Sackett was not admissible under the parol evidence rule because it was related to and contradicted Lee's workers' compensation policy;

 e. An application was required as a matter of law;

 f. USF & G was bound as a matter of law by its report of Diana Conley's accident as being within Classification Code 9016 and there was no evidence that any of Lee's employees' activities fell outside a water park classification code.

3. The Court committed clear error and its decisions have been manifestly unjust in denying Lee judgment as a matter of law on the counterclaim of Aon for the reasons set forth above and in that Lee did not make a misrepresentation to Aon, Aon did not rely on any representation, and reliance, if any, by Aon was not a substantial factor in causing harm to Aon;

4. The Partial Judgment erroneously does not require USF & G to return all premiums Lee paid;

5. The Partial Judgment erroneously references FRCP 55(b) as the basis for the judgment;

6. The Partial Judgment erroneously states that Lee has stipulated that USF & G's alleged alter ego claims are reserved for later determination when Lee has previously objected to the inclusion of these claims in the litigation at all and the Court on its own set them for separate trial;

7. The Partial Judgment erroneously states that Lee stipulated to a determination of Diana Conley's claims;

8. The Partial Judgment prematurely awards restitution and erroneously fails to include as issues remaining for further trial (a) whether USF & G actually paid and is the real party in interest respecting any amount for which its seeks restitution, and (b) USF & G's breach of its duty to defend Lee in this action and the WCAB proceeding.

A. *Governing Standards.*

With regard to a motion to alter or amend judgment pursuant to Rule 59(e), Federal Rules of Civil Procedure, 11 Wright, Miller & Kane, Federal Practice and Procedure: Civil 2nd § 2810.1, explains:

> Since specific grounds for a motion to amend or alter are not listed in the rule, the district court enjoys considerable discretion in granting or denying the motion. However, reconsideration of a judgment after its entry is an extraordinary remedy which should be used sparingly. There are four basic grounds upon which a Rule 59(e) motion may be granted. First, the movant may demonstrate that the motion is necessary to correct manifest errors of law or fact

upon which the judgment is based. Second, the motion may be granted so that the movant may present newly discovered or previously unavailable evidence. Third, the motion will be granted if necessary to prevent manifest injustice. Serious misconduct of counsel may justify relief under this theory. Fourth, a Rule 59(e) motion may be justified by an intervening change in controlling law. The Rule 59(e) motion may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment. Also, amendment of the judgment will be denied if it would serve no useful purpose. [Footnotes omitted]

Rule 60(a), Federal Rules of Civil Procedure, provides that "[c]lerical mistakes in judgments, orders or other parts of the records and errors therein arising from oversight or omission may be corrected by the court ... on the motion of any party ...."

Rule 60(b), Federal Rules of Civil Procedure, provides in pertinent part:

On motion and upon such terms as are just, the court may relieve a party ... from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; ... (3) ... misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) ... it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment.

Other than reciting these standards, Lee does not otherwise refer to them in its memorandum of points and authorities. While some of the claims are easily relatable to these standards, others are not. For instance, what is the mistake, inadvertence or excusable neglect of Lee, and what is the misrepresentation or other

misconduct of an adverse party? In addition, Lee does not set forth the standards governing resolution of a Rule 60(b) motion on these two grounds. The Ninth Circuit in *Lafarge Conseils et Etudes, S.A. v. Kaiser Cement & Gypsum Co.*, 791 F.2d 1334, 1338 (9th Cir.1986), explains:

A motion brought under 60(b)(6) must be based on grounds other than those listed in the preceding clauses ... Clause 60(b)(6) is residual and 'must be read as being exclusive of the preceding clauses.' In addition, the clause is reserved for 'extraordinary circumstances.'
. . . .

### B. *WCAB Exclusive Jurisdiction.*

Lee asserts that the Partial Judgment is void because the WCAB had and has exclusive jurisdiction over USF & G's claim for rescission of the workers' compensation insurance policy.

By Order filed on October 23, 1999 (Doc. 21), the Honorable Robert E. Coyle denied the motion to dismiss filed by then Defendant Diana Conley and joined by Lee. Conley and Lee moved to dismiss this action pursuant to Rule 12(b)(6), Federal Rules of Civil Procedure, for failure to state a claim upon which relief can be granted, on the ground that the WCAB has exclusive jurisdiction over the controversy. Judge Coyle ruled in pertinent part:

California Labor Code § 5300(a) provides that a proceeding for the "recovery of compensation, or concerning any right or liability arising out of or incidental thereto" "shall be instituted before the appeals board and not elsewhere".

In arguing that the allegations of Fidelity's Complaint are subject to the exclusive jurisdiction of the WCAB pursuant to Section 5300(a), defendants rely on a number of California cases.

Thus, defendants refer the court to *General Acc. Etc. Corp. v. Indus. Acc. Com.,* 196 Cal. 179, 237 P. 33 (1925). *General Acc., Fire & Life Assur. Corp.* involved a review by the California Supreme Court of an award made by the Industrial Accident Commission in favor of the dependents of a deceased employee, the sole [issue] presented to the Commission being whether the petitioner insurance company was, on the day of the fatal accident, the insurance carrier of the employer. The employer had applied for a workers' compensation insurance policy but had not paid the premium for it. On the day the employee was killed, the employer presented the premium check to his insurance agent, not advising the agent of the accident until two days later. The insurance company petitioned the Commission to rescind the policy because of fraud in the procurement of the policy. The California Supreme Court reversed the award of the Commission on the ground that the Commission's finding was not supported by any evidence. On appeal, the Supreme Court stated in pertinent part:

It is the contention or suggestion of respondent Commission that the dependents of the employee have an enforceable right against petitioner under the alleged policy even though the employer be cut off from any remedy against petitioner. We are unable to understand what principle of law would give the dependents of the employee a cause of action against petitioner upon a contract which is void or voidable as to the employer ... 'We may assume that any defense available to the Insurance Company ... against ... the employer, would be equally available against the employee or his dependents.' Whether the foregoing quotation be regarded as doctrine or *dicta,* it would seem to ex-

press an unimpeachable principle of law ....

There can be no doubt but that the Commission is vested by constitutional and legislative power to hear and determine every issue raised by the parties to this controversy, including the validity of the policy and the question of fraud alleged in its procurement and that the parties are not required to invoke either a court of law or equity in the determination of said question.

196 Cal. at 190–191, 237 P. 33.

Defendants also rely on *Bankers Indem. Ins. Co. v. Indus. Acc. Com.,* 4 Cal.2d 89, 94–98, 47 P.2d 719 (1935), wherein the Supreme Court held that Industrial Accidents Commission "has been invested with the power and authority to hear and determine equitable issues, including those arising in a controversy involving the reformation of a written instrument" and that the Supreme Court "was ... in accord with the policy of the law which invests in one tribunal the power to dispose of the whole controversy involving the right of the injured employee to secure just compensation for the injury sustained by him." 4 Cal.2d at 98, 47 P.2d 719.

Conley argues that the critical fact that brings this case within the exclusive jurisdiction of WCAB is that the outcome of this controversy will determine her rights to recovery of workers' compensation benefits.

Conley refers the court to *United States Fidelity and Guaranty Company v. Superior Court,* 214 Cal. 468, 6 P.2d 243 (1931). In *USF & G,* in a proceeding before the Commission in which the employer and the insurance company were defendants, the employee procured a compensation award against the defendants. In the proceeding before the

Commission, the employer and the insurance company filed answers presenting the issue whether the insurance company was the compensation carrier for the employer at the time of the accident. The Commission found that the insurance company was not then the insurance carrier for the employer and ordered the insurance company released and discharged. No appeal was taken and the Commission's award became final. Some months later, the employer sued the insurance company for breach of the insurance contract, seeking damages for termination of the insurance policy without notice as required by the policy. The insurance company unsuccessfully demurred on the ground of lack of jurisdiction. The insurance company petitioned for a writ of prohibition. The California Supreme Court held that issues relating to the existence, at the time of the injury, of an insurance policy affording coverage and issues relating to the enforcement against the insurance company of any liability for compensation or for the payment of the workmans' compensation award had reached a final determination in the proceedings before the Commission. However, the Supreme Court held, to the extent the action is one for damages for breach of contract to issue and keep in effect the insurance, the complaint stated a cause of action within the jurisdiction of the Superior Court. In so holding, the Supreme Court explained:

> The cause of action for damages does not involve the construction of an insurance policy with respect to coverage thereunder, the recovery of compensation or incidental liability or the enforcement against an insurance carrier of compensation liability; it attempts to set forth purely a claim for damages based upon the breach of a contract to insure in a controversy affecting only the employer and the insurance carrier, no rights of the employee being involved. The mere circumstance that the damage claimed is the exact amount of the compensation award to the employee does not change the essential nature of the action and the court should not be prevented from proceeding with it.

214 Cal. at 471–472, 6 P.2d 243.

Defendants further refer the court to *Hartford Acc. & Indem. Co. v. Indus. Acc. Com.,* 216 Cal. 40, 13 P.2d 699 (1932). In *Hartford Acc. Etc. Co.,* the Commission ordered the employer to obtain a surety bond as a prerequisite to the issuance to the employer of a certificate of self-insurance to secure the payment to its employees of workers' compensation benefits. The employer obtained a surety bond from Hartford. During the time the bond was in force, claims were made by the employees which awards were covered by the bond. Thereafter, in the district court, a receiver was appointed for all of the property and assets of the employer. The receiver stopped payment of the workers' compensation awards. At the time the receiver did so, the total amount of the awards exceeded the amount of the bond. The employees then petitioned the Commission for an order requiring Hartford, as surety on the bond, to pay or provide payment of the compensation remaining unpaid on account of the workers' compensation awards. Hartford appeared in the Commission proceedings. The Commission ordered Hartford to pay the amount of the bond. On appeal, Hartford argued that the Commission had no jurisdiction to render an award against the surety on a self-insurer's bond. The Supreme Court rejected this argument, holding that the provisions of the workers' compensation act regulating a self-insurer employer and providing for the

giving of a bond are one method of securing the payment of compensation and, therefore, within the grant of power to the Commission. *Id.* at 45–46, 13 P.2d 699. The Supreme Court further held that the employees' petition was a "proceeding for the recovery of compensation, or concerning any right or liability arising out of or incidental thereto" and that, therefore, "[t]here can be no question of the jurisdiction of the Commission to entertain such a proceeding and to determine all issues arising therein and to render an award in accordance with the facts presented to it." *Id.* at 46, 13 P.2d 699. The Supreme Court further stated in pertinent part:

> Petitioner complains that the granting of relief against it in the proceedings before the ... Commission deprived it of legal and equitable rights to which it would otherwise be entitled. These rights petitioner claims are given it under sections 2845 and 2846 of the Civil Code and section 1050 of the Code of Civil Procedure. If petitioner is entitled to any rights under these sections of the code which it could not enforce before the Commission, it might be relegated to the courts for the purpose of enforcing them. This result would not affect the jurisdiction of the Commission if the Constitution and statutes have conferred jurisdiction upon the Commission to determine the matter involved. However, if the Commission is vested with jurisdiction over any given subject matter, it has the power to hear and determine every issue raised by the parties in the controversy ... In such cases the parties are not required to resort to the courts.

*Id.* at 47, 13 P.2d 699.

Fidelity argues that Section 5300(a) does not cover a claim for rescission of an insurance policy because a claim for rescission does not involve "the recovery of compensation, or concerning any right or liability arising out of or incidental thereto." Fidelity asserts that it does not contend that Conley cannot proceed before the WCAB for the recovery of workers' compensation benefits against Lee Investments but, rather, that the WCAB does not have jurisdiction of the claim for rescission of the Policy. Fidelity argues that the Supreme Court's decision in *General Acc. Etc. Corp.* is not controlling on this issue. In so arguing, Fidelity notes that no issue concerning the Commission's jurisdiction was raised by the insurance company in the appeal because the insurance company was the petitioner. In addition, Fidelity notes that the insurance company in *General Acc. Etc. Corp.* did not seek rescission of the policy in proceedings before the Commission but rather a determination that the insurance company was not liable.

Fidelity notes that the type of relief that can be granted by the court and by the WCAB differs. Thus, the trial court cannot award workers' compensation benefits, and the WCAB cannot award damages for injuries. *La Jolla Beach & Tennis Club, Inc. v. Industrial Indemnity Co.,* 9 Cal.4th 27, 35, 36 Cal.Rptr.2d 100, 884 P.2d 1048 (1994); *Scott v. Industrial Acc. Com.,* 46 Cal.2d 76, 82–83, 293 P.2d 18 (1956). In *State Comp. Ins. Fund v. Ind. Acc. Com.,* 20 Cal.2d 264, 125 P.2d 42 (1942), the California Supreme Court held that the Commission was "without jurisdiction to adjudicate a supplemental controversy involving rights of contribution and reimbursement between two insurance carriers jointly and severally responsible for the payment of a compensation award." *Id.* at 266, 125 P.2d 42. In so holding, the Supreme Court distinguished *General Acc. Etc. Corp. v. Indus. Acc. Com.,* and

*Bankers Indem. Ins. Co. v. Indus. Acc. Com.*, explaining in pertinent part:

> While petitioner concedes that the jurisdiction of the commission is limited to the settlement of disputes arising out of the relationship of the employer to his employee, it urges that once this status is established the commission has judicial power to determine any controversy whatsoever that may develop between parties in interest respecting the compensation awarded. Upon this basis the petitioner contends that its application for an adjustment of its obligation to make compensation payments falls within the scope and intent of the ... constitutional provision referable to the insurance features of the 'system of workman's compensation' and the legislative enactment adopted in pursuance thereof. In support of its argument the petitioner first cites several decisions of this court wherein it was held that in determining the liability of an insurance carrier for compensation to an injured employee, the commission had the power to determine all issues of law and fact upon which the liability of the insurance carrier depended ... But in those cases the respective questions regarding the insurance aspect of the proceeding before the commission arose in connection with the rendition of an *award in favor of an injured employee or his dependents* and necessarily were involved in the enforcement of the compensation benefits contemplated under the basic liability of the employer to his employee. The present situation is readily distinguishable in that here the right of action in the employee to enforce his claim was finally determined by the joint and several award in his favor against the insurance carriers which had assumed the obligation of the respective employers in the premises. By such award the employee was assured of the scheduled payments, and the employers were discharged from all liability therefor. This adjudication concluded the authority of the commission to act in the matter. Any controversy between the insurance carriers relative to the burden of payment of the award for which both have been held responsible concerns neither the employee nor the joint employers in their essential relationship. Application for the adjustment of such dispute obviously is not a proceeding *'for the recovery of compensation'* nor does it involve 'any right or liability arising out of or incidental thereto.' The fact that the petitioner has joined the employee as a nominal party in this proceeding cannot change the basic character of the litigation as an independent claim having no relation to the enforcement of benefits *allowed the employee* under the system of workman's compensation established in this state. The petitioner is seeking an award in *its* favor based on a claim wholly distinct from the right of an employee to recover compensation for an industrial injury. These considerations plainly indicate that the commission is not vested with constitutional or legislative power to determine the issues involved in a proceeding supplemental to the adjudication of the liability of the employer to his employee, and the petitioner must seek its relief in the ordinary courts ....

*Id.* at 267–268, 125 P.2d 42.

Here, as noted, the Complaint alleges that Fidelity has paid benefits to Conley under the Policy because her claims, but for the rescission of the Policy, would be covered by the Policy.

Fidelity further argues that, contrary to Conley's assertion, the outcome of this Complaint for rescission will not determine Conley's right to recovery of compensation benefits. In so arguing, Fidelity notes that, pursuant to California Labor Code § 3715(a), an employee whose employer has failed to secure the payment of compensation under the workers' compensation laws may, in addition to proceeding to proceeding against the employer by civil action, "file his or her application with the appeals board for compensation and the appeals board shall hear and determine the application for compensation in like manner as in other claims and shall make the award to the claimant as he or she would be entitled to receive if the employer had secured the payment of compensation as required ...." Section 3715(a) further requires the employer to pay the award so ordered or furnish a bond to do so. If the employer fails to pay the award or post the bond as ordered pursuant to Section 3715(a), "the award, upon application by the person entitled thereto, shall be paid ... from the Uninsured Employers Fund ...." California Labor Code § 3716(a). Therefore, Fidelity argues, if rescission is granted, Conley can recover benefits from her employer or from the Uninsured Employers Fund.

The court concludes that this motion to dismiss is denied on this ground. The court is not persuaded that Fidelity's claim for rescission is within the exclusive jurisdiction of the WCAB because Fidelity has paid the benefits under the Policy. That Fidelity sues to recover the benefits paid (less premium) from the employer on a theory of rescission does not affect Conley's proceedings before the WCAB or her entitlement to benefits.

Judge Coyle's denial of the motion to dismiss for lack of jurisdiction is contended by Lee to have required Lee to file a counterclaim against USF & G or risk loss of the counterclaim under Rule 13(a), Federal Rules of Civil Procedure. *See discussion infra.* Lee filed its counterclaim on February 7, 2000. (Doc. 40). A decision by a Workers' Compensation WCJ issued on October 20, 1999, found that the WCAB has subject matter jurisdiction over the issue of rescission of the USF & G policy issued to Lee. On December 24, 1999, the WCAB denied USF & G's petition for reconsideration of the decision of the WCJ and ruled that the matter be held in abeyance by the WCJ pending disposition of Conley's motion for reconsideration by Judge Coyle. After USF & G's petitions for review were denied by the California Court of Appeal, Fifth Appellate District and the California Supreme Court, Conley moved for reconsideration by Judge Coyle of his ruling denying the motion to dismiss. Lee did not join in Conley's motion for reconsideration. Conley's motion for reconsideration was denied by Order filed on August 17, 2000 (Doc. 57). Judge Coyle ruled in pertinent part:

In moving for reconsideration, Conley relies on the decisions of the WCAB that the WCAB has exclusive jurisdiction over the rescission claim because, if the Policy is rescinded, there will be an impact on Conley's ability to receive benefits. The WCJ ruled that

While there is available to the injured worker the Uninsured Employers Fund there is often significant delay in obtaining access to that fund and on occasion the Fund is not adequately funded for the year and they run out of the means to maintain benefit payments. Also if the rescission [sic] action is pending in Federal Court, UEF would not pick up benefits for the applicant on the basis that the issue of whether or not the employer was insured for workers [sic] compen-

sation liability had not been decided. A final decision in Federal Court could be delayed for a significant period of time, whereas the Board's procedures are set up for a prompt resolution of issues. From a reading of the cases cited in the briefs and also referred to in the Federal Court's decision the distinguishing fact as to which forum has jurisdiction over the rescission [sic] of the contract issue appears to be whether or not the applicants [sic] access to benefits is going to be affected. If they are then the WCAB has jurisdiction if not then the civil courts (federal or state) have jurisdiction. For the reasons discussed above the WCALJ is of the opinion that if the Board finds that they do not have jurisdiction then there would be a significant impact on the applicant's ability to receive benefits in a timely manner.

This ruling is now final in the California courts because of the denials of Fidelity's petitions for review.

However, in a supplemental brief filed on March 9, 2000, Fidelity notes that Lee Investments had filed a counterclaim against, [sic] Fidelity, AON [sic] Risk Services, American Speciality [sic] Insurance Services, Inc., and American Speciality [sic] Risk Management Services, LLC, alleging causes of action for breach of fiduciary duty, fraud, conspiracy to defraud, and negligent misrepresentation. Fidelity contends that, because the allegations of the counterclaim arise out of the same facts as the complaint for rescission, all of the issues in the Complaint will be before the court in any event. Even if the Complaint for Rescission is dismissed for lack of jurisdiction, Fidelity's claim for rescission would be a compulsory counterclaim to Lee Investments' counterclaim. Therefore, the court will have to decide the rescission claim. Furthermore, any de-

cision by the WCAB concerning Fidelity's claim for rescission would not be binding on the counterdefendants, because they are not and cannot be parties to the workers' compensation proceedings. Therefore, Fidelity contends, Lee Investments' counterclaim provides an independent basis for this court to deny Conley's Application for Reconsideration.

The court notes that Conley has not responded to these grounds for denial of the Application for Reconsideration. This failure persuades the court that the Application for Reconsideration should be denied. While the decision by the WCAB is entitled to deference, the court remains persuaded that its initial decision was not contrary to law. The filing of Lee Investments' counterclaim is another reason for this court to exercise its jurisdiction.

Lee's contention that the Partial Judgment is void because of the exclusive jurisdiction of the WCAB is without merit. As explained in 11 Wright, Miller & Kane, Federal Practice and Procedure: Civil 2nd § 2862, pp. 326–329:

A judgment is not void merely because it is erroneous. It is void only if the court that rendered it lacked jurisdiction of the subject matter, or of the parties, or if it acted in a manner inconsistent with due process of law.

 Lee's argument about "exclusive jurisdiction" confuses the issue. "The jurisdiction of the federal courts—their power to adjudicate—is a grant of authority to them by Congress and thus beyond the scope of litigants to confer." *Neirbo Co. v. Bethlehem Shipbuilding Corporation,* 308 U.S. 165, 167, 60 S.Ct. 153, 84 L.Ed. 167 (1939). This Court had subject matter jurisdiction over this action by virtue of diversity of citizenship, which subject matter jurisdiction may not be enlarged or

contracted by state law. *See Begay v. Kerr–McGee Corp.,* 682 F.2d 1311, 1315 (9th Cir.1982) ("Although the states have the power to prevent the federal court from granting relief in a diversity case by denying the substantive right of action asserted, they 'have no power to enlarge or contract the federal jurisdiction."); *Beach v. Owens–Corning Fiberglas Corp.,* 728 F.2d 407, 409 (7th Cir.), *cert. denied,* 469 U.S. 825, 105 S.Ct. 104, 83 L.Ed.2d 48 (1984) ("Even though Indiana law vests exclusive jurisdiction over cases such as this one in its Industrial Disputes Board, a federal court properly may exercise jurisdiction over them. State law cannot be construed to enlarge or contract federal jurisdiction."). Lee's contention that the Partial Judgment must be vacated because of the exclusive jurisdiction of the WCAB is an issue relating to failure to state a claim upon which relief can be granted. *See discussion infra.* Its argument that the federal court lacks diversity subject matter jurisdiction over this case is misplaced and is no basis for setting aside judgment.

Lee's motion on this ground is DENIED.

### C. *Claims of Clear Error and Manifest Injustice By Not Granting Lee Judgment as a Matter of Law on the Original and Amended Complaints of USF & G.*

#### 1. *WCAB Had and Has Exclusive Jurisdiction.*

Lee asserts that USF & G's Complaint and Amended Complaint fail to state a claim upon which relief can be granted because the WCAB had and has exclusive jurisdiction.

Lee relies on a state case, *Gilford v. State Compensation Ins. Fund,* 41 Cal. App.3d 828, 834 (1974) (" ' "Where there is any reasonable doubt as to the jurisdiction, the courts must resolve such doubts in favor of jurisdiction of the commission." ' "), and argues that Judge Coyle's rulings were clearly in error and manifestly unjust:

> Ms. Conley now faces precisely the concerns that the WCJ expressed. If there were any reasonable doubt, which there is not, about the exclusive jurisdiction of the WCAB to decide the rescission issue ..., that doubt must be resolved in favor of the exclusive jurisdiction of the WCAB.

> Lee preserved its position regarding the exclusive jurisdiction of the WCAB by joining Ms. Conley's initial motion. The denial of that motion compelled Lee to file a compulsory counterclaim and to otherwise protect its rights in this action. It was manifestly unjust and clear error for the court to deny the initial motion and then, having erroneously put Lee to the necessity of filing a compulsory counterclaim, to use that counterclaim as a basis to say the motion to dismiss was properly granted in the first place.

> Since USF & G's complaint was the entire action when the original motion to dismiss was filed, the entire action should have been dismissed on the original motion. Had it been, Lee would not have filed a counterclaim nor a third party complaint. The judgment is therefore void in its entirety.

USF & G and Aon oppose this motion, contending that Judge Coyle's rulings were correct as a matter of law. As a matter of practicality, Connelly has received and continues to receive full workers' compensation benefits which have been fully paid by USF & G under a reservation of rights.

Rule 59(e) may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment.

That is what Lee is doing here. Lee's motion to amend or alter the partial judgment pursuant to Rule 59(e) on the ground that the WCAB had and has exclusive jurisdiction is DENIED.

USF & G argues that Judge Coyle's decision that the district court had jurisdiction over USF & G's complaint for rescission was binding on the WCAB because the district court first obtained jurisdiction over the complaint. USF & G acknowledges that Ms. Conley's initial application for workers' compensation benefits was filed before USF & G filed the complaint for rescission in the district court. However, USF & G contends, Ms. Conley's initial application named only The Island and GAB Business Services and only sought liability for temporary disability indemnity and did not seek adjudication of any claim for rescission by USF & G against Lee. USF & G filed its complaint for rescission in the district court on April 26, 1999. USF & G contends that the declaration of readiness to proceed seeking arbitration by the WCAB of the rescission complaint was not filed by Conley until two months later. USF & G cites *Scott v. Industrial Accident Commission,* 46 Cal.2d 76, 293 P.2d 18 (1956).

In *Scott,* the California Supreme Court issued a writ of prohibition to halt proceedings in a matter before the Industrial Accident Commission until a final judgment was reached in a superior court action in which damages were sought for the same injuries as were involved in the Industrial Accident Commission matter. The California Supreme Court ruled:

> The question thus presented is whether the Industrial Accident Commission may, and should, be required to suspend the exercise of its jurisdiction in the proceeding before it because of the pendency of the action in the superior court or on appeal therefrom. The issue is

not one of simultaneous exercise of general concurrent jurisdiction; it is, rather, the right of proceeding simultaneously in two tribunals, the jurisdiction of each of which is essentially exclusive of the other, but each of which has the power to make a determination of jurisdiction which, when final, will be conclusive upon the other.

*Id.* at 81, 293 P.2d 18. The Supreme Court noted that

> General principles applicable to controversies in which the same parties and the same subject matter are involved are these: When two or more tribunals in this state have concurrent jurisdiction, the tribunal first assuming jurisdiction retains it to the exclusion of all other tribunals in which the action might have been initiated. Thereafter another tribunal, although it ordinarily might originally have taken jurisdiction, may be restrained by prohibition if it attempts to proceed.

*Id.* The Supreme Court concluded that "the general rule long recognized as governing tribunals whose jurisdiction is generally concurrent should be applied here where jurisdiction to determine jurisdiction is concurrent." *Id.* at 89, 293 P.2d 18.

Lee replies that California Insurance Code § 11653 defines "employer" to include the employer's workers' compensation insurer. USF & G was a party to Ms. Conley's initial application for workers' compensation benefits as a matter of law and, therefore, the WCAB had jurisdiction over USF & G more than one month before this action for rescission was commenced. Further, Lee replies that USF & G's reliance on *Scott* is misplaced because the jurisdiction of the WCAB was exclusive even of this court's jurisdiction to determine jurisdiction. Lee argues:

> Here, there was no basis for the District Court to have *any* jurisdiction to deter-

mine the rights of Conley and Lee against USF & G. Unlike *Scott*, Conley did not sue Lee in this court seeking damages upon a theory that Conley was not within the course and scope of employment. Conley did not otherwise tender to the District Court a precedential jurisdictional ('precedential jurisdiction' herein shall refer to concurrent jurisdiction to determine jurisdiction) issue that the District Court could properly decide to determine whether the District Court had exclusive jurisdiction to proceed with the rescission action.

Aon argues that, even if, *arguendo*, it is concluded that the WCAB had exclusive jurisdiction over USF & G's rescission claim and the Partial Judgment for USF & G on rescission were vacated for failure to state a claim, such a ruling should not affect the rest of the Partial Judgment:

> In such an event, it would be an abuse of discretion for this Court not to continue to exercise its supplemental jurisdiction over (and confirm its judgment concerning) Lee's claims and defenses against all other parties, and Aon's claim and defenses against all other parties.

Lee replies that had the motion to dismiss been granted, Lee would have never filed a counterclaim:

> Hence, Aon cannot use the existence of that counterclaim, which the improper retention of jurisdiction in this court forced Lee to file, as a basis to contend that the partial judgment ought not to be vacated. Had the complaint been dismissed, there would be no basis whatsoever for supplemental jurisdiction because there were no other claims filed at that time.

Lee further argues that, even if it is proper at this time to examine supplemental jurisdiction over Lee's counterclaim and third party complaint, supplemental jurisdiction should not be retained:

> First, there is a strong preference for dismissal of supplemental claims where all claims over which the court had original jurisdiction have been dismissed, even if there have been extensive proceedings in federal court ... Second, the fundamental question whether or not there was a misrepresentation that would allow rescission of the subject policy is necessarily precedent to whether Lee could have any liability to Aon.... [T]he question whether the USF & G policy should be rescinded is exclusively committed to the jurisdiction of the ... WCAB ... It is thus a state law issue that substantially predominates ... Third, the existence of the parallel proceedings before the WCAB ... strongly supports dismissal of the entire action rather than retention of Lee's counterclaim and third party complaint.

■ Lee's position concerning the exercise of supplemental jurisdiction is categorically meritless. The district court has discretion to retain pendent claims and may consider the resources invested in a case. *See Schneider v. TRW, Inc.*, 938 F.2d 986, 993–995 (9th Cir.1991).

Lee assumes, *arguendo*, if there were "concurrent precedential jurisdiction for both the WCAB and this court", i.e., that the district court had jurisdiction to determine whether or not the jurisdiction of the WCAB was exclusive under the circumstances, the *Scott* rule required this court to honor the final decision of the WCAB in favor of the WCAB's exclusive jurisdiction. Lee cites a state case, *Aetna Casualty & Surety Co. v. Aceves*, 233 Cal.App.3d 544, 284 Cal.Rptr. 477 (1991).

In *Aceves*, Aetna filed an action in the Superior Court before Aceves began proceedings before the WCAB. On appeal, Aetna argued that the Superior Court had jurisdiction to determine its own jurisdiction, and because Aetna filed the Superior

Court action first, the Superior Court's determination took priority. Relying on *Scott v. Industrial Accident Commission, supra,* the Court of Appeals agreed. 233 Cal.App.3d at 551–554, 284 Cal.Rptr. 477.

Lee also argues that it is immaterial that the WCAB would not afford the same remedy to USF & G that it might otherwise have in the district court. Lee refers to *Goetz v. Aetna Casualty and Surety Company,* 710 F.2d 561 (9th Cir.1983). In *Goetz,* the Goetzes filed an action with the Industrial Accident Commission when Aetna failed to pay accrued benefits. The Board issued an award against Aetna, which paid part of the award and failed to pay the balance. The Goetzes filed a complaint in the district court alleging that Aetna's conduct in delaying and refusing to pay workers' compensation benefits due them violated California Insurance Code § 790.03(h). The district court granted Aetna's motion to dismiss on the ground that the court lacked jurisdiction over the subject matter of the action because California law vested exclusive jurisdiction of the dispute in the Appeals Board. 710 F.2d at 563. On appeal, the Goetzes argued that the California workers' compensation scheme violates the equal protection clause of the Fourteenth Amendment. In rejecting this argument, the Ninth Circuit ruled:

> The Goetzes' equal protection argument challenges not classifications apparent from the face of a statute but categories which result from the differing reaches of the workers' compensation and unfair practices laws. While the challenge is unusual, we do not reject it for this reason. A statute does not escape equal protection scrutiny simply because it does not expressly effect the objectionable variation ... The California workers' compensation law does not arbitrarily deprive claimants of their rights, however-er. The remedy provided by section 5814 of the Labor Code may not be as

effective as that provided by section 790.03 of the Insurance Code, but this is merely an aspect of the exclusivity trade-off underlying the workers' compensation statute. The respective legislative classifications reasonably relate to the legitimate state ends underlying the workers' compensation and unfair practices statutes. Since they 'advance[ ] legitimate legislative goals in a rational fashion ..., they do not offend equal protection.

*Id.* at 564. It is "completely irrelevant in this case", Lee contends, that the "district court cannot award workers' compensation benefits and the WCAB cannot award damages for injuries."

USF & G argues that, because Conley abandoned any effort to challenge the jurisdiction of this Court, Lee cannot now do so. USF & G notes that Lee did not join in Conley's Application for Reconsideration but, instead, filed on December 17, 1999, a motion to file a counterclaim in this action against USF & G, ASI, and Aon. (Doc. 27). The motion was granted by Magistrate Judge Snyder on January 26, 2000. (Doc. 37) Lee's counterclaim was filed on February 7, 2000. (Doc. 40). Lee was ordered to file an amended counterclaim by Order filed on August 17, 2000, (Doc. 58), which Lee did on August 31, 2000. (Doc. 59). On January 24, 2001, a Stipulation Dismissing Diana Conley from Action Without Prejudice was ordered, (Doc. 73), wherein USF & G, ASI, and Diana Conley stipulated in pertinent part:

1. The above-captioned action shall be dismissed without prejudice as to defendant Diana Conley only.

2. Diana Conley shall be bound by all orders, findings, conclusions, determinations, decrees, stipulations, judgments, and/or settlements made, entered or entered into, as the case may be, in or in connection with the above-captioned ac-

tion, in the same manner and to the same extent as if Diana Conley had continued to be a party to said action and had participated in the litigation therein.

According to the Declaration of Bruce T. Smyth filed in opposition to Lee's motion, (Docs.738–740):

14. On April 18, 2006, seven years after Diana Conley filed her application for benefits before the WCAB, and faced with an imminent trial in this court, Lee filed a 'declaration of readiness' to have USF & G's complaint adjudicated by arbitration by the WCAB. USF & G promptly filed objections to the declaration of readiness and request for arbitration and reply memorandum to Lee's opposition. Conley subsequently filed a declaration of readiness also ... At a settlement conference before the Honorable Adrienne Allen, Workers Compensation Administrative Law Judge, on May 22, 2006, Conley *withdrew* her declaration of readiness and request for arbitration. Judge Allen then set a continued settlement conference before the presiding judge of the San Bernardino Division of Workers Compensation Appeals Board, Honorable Charles Regnell, for June 13, 2006. At the settlement conference on June 13, 2006, Judge Regnell held that a trial should be conducted on the issue of whether the matter should not be sent to arbitration, based on the contentions of USF & G that Lee had warned [sic] and/or was estopped from asserting the jurisdiction of the WCAB, and set another settlement conference, which subsequently [sic] held on August 29, 2006.

15. At that conference, Lee's counsel asserted that the counsel for USF & G in the workers compensation matter, Greg Geisler of Morse, Geisler & Callister, in fact had previously represented Lee. The WCAB accordingly set another status conference for September 26, 2006 to consider the threshold issue of whether there was a conflict of interest by virtue of Mr. Geisler's alleged representation. On November 15, 2006, the parties entered into a stipulation for the exchange of information and discovery in connection with Lee's subsequent motion before the WCAB to disqualify Mr. Geisler and Charston, Revich & Chamberlin, LLP. The Court set a conference for December 13, 2006, which was subsequently continued to late January, 2007. On January 26, 2007, at the request of counsel for USF & G because of the trial in this matter, the status conference before the WCAB was continued to May 2, 2007.

. . .

16. USF & G contends that its complaint for rescission of the insurance policy has been resolved by the jury's verdict and the partial judgment. Lee in any event failed to bring the complaint for rescission to adjudication by the WCAB, first by failing to take *any action to do so for seven years* and *then* by delaying any action by *a frivolous motion to disqualify USF & G's counsel.* If USF & G's complaint had not been resolved in this Court, Lee would still need (1) to have the issue of disqualification of USF & G's counsel heard by the WCAB and (2) then have the issues of whether Lee waived and/or was estopped from asserting the jurisdiction of the WCAB tried by the WCAB. Because the judgment of rescission against Lee in this Court bars its claim before the WCAB, Lee cannot proceed in that forum.

USF & G and Aon argue that Lee's assertion that Judge Coyle's denial of Conley's initial motion to dismiss compelled Lee to file a compulsory counterclaim and to otherwise protect its rights in this action and that it was manifestly unjust and clear error to use that counterclaim as a

basis to say the motion to dismiss was properly granted in the first place is without merit and does not justify granting Lee's motion. First, Lee argues that it had to assert its counterclaims in this court or lose them, because they would have been barred by the statute of limitations and such claims could not be pursued before the WCAB, which did not have jurisdiction over the claims for fraud, negligent misrepresentation, breach of oral contract and negligence alleged by an alleged policyholder against the insurer and did not have jurisdiction of claims against the managing general agent, ASI. Further, it is argued:

> Nothing forced Lee to file its claims in federal court. Lee could have preserved its claims by filing them in state court or by entering into a tolling agreement with USF & G. Other options were available to Lee as well. Lee and Ms. Conley could have petitioned the Ninth Circuit for a writ to review the denial of Conley's motion. Lee and Ms. Conley also could have sought permission from the Ninth Circuit to take an interlocutory appeal under 28 U.S.C. § 1292(b). Instead, Lee chose to litigate its claims in this Court and aggressively pursued them through summary judgment and trial.

Lee replies that USF & G and Aon cite no authority that the filing of the counterclaim rendered Lee's objections to jurisdiction moot:

> Parties do not waive objections properly made and preserved by continuing to participate in the litigation after their objections have been overruled. The pertinent question is whether Lee had filed a counterclaim before the motion to dismiss was brought and decided. No such counterclaim had been filed.

USF & G argues that Lee has waived any right and is estopped to seek adjudication of USF & G's complaint by the WCAB by failing to proceed in that forum for seven years. USF & G notes that Lee did not assert that the WCAB had jurisdiction in its Answer, as an affirmative defense or otherwise. Lee did not join in Ms. Conley's application for reconsideration of the motion to dismiss but, rather, filed a counterclaim and expressly sought to have the District Court adjudicate the issues in USF & G's Complaint by moving for summary judgment. USF & G contends that Lee waited until after its motion for summary judgment had been denied, "after its phony threat of bankruptcy had been rejected by USF & G," and until trial was imminent before filing a "declaration of readiness" for arbitration before the WCAB. (Citing *Sea World Corp. v. Superior Court*, 34 Cal.App.3d 494, 110 Cal.Rptr. 232 (1973)) and *Magliulo v. Superior Court*, 47 Cal.App.3d 760, 121 Cal.Rptr. 621 (1975), USF & G contends that Lee has waived any right to seek and is estopped from obtaining adjudication before the WCAB.

Lee replies that it has not waived and is not estopped to have the WCAB adjudicate the rescission issue. Lee asserts that *Sea World* is inapposite:

> Here ... Conley and Lee promptly moved this court to dismiss the action based on the exclusive jurisdiction of the WCAB and did not submit to this court for decision any precedential jurisdictional question of fact as occurred when the employer in *Sea World* asked the Superior Court to decide the issue of course and scope of employment. USF & G confuses waiver of the right to have a tribunal determine an issue of concurrent jurisdiction to determine jurisdiction, such as course and scope of employment, with waiver of a right of general jurisdiction once found. A party can waive having the WCAB determine a precedential jurisdictional issue like course and scope of employment by

submitting that issue to the court for it to decide under its concurrent jurisdiction to determine jurisdiction, but one cannot waive the general jurisdiction of either tribunal once that has been found nor can a tribunal's exercise of its own general jurisdiction be a subject of estoppel.

USF & G and ASI have not cited a single case that holds that *general* jurisdiction can be waived or that the exercise of such jurisdiction, once obtained, can somehow be estopped. Although there may be other remedies for a party's alleged delay in pursuing remedies before a tribunal that has general jurisdiction, USF & G have not pursued any such other remedies. *Sea World* and its progeny are inapplicable to the facts of this case.

In its *reply* brief, Lee contends that USF & G's failure to join the Uninsured Employers' Fund (UEF) as a party to this action requires that the judgment be vacated. This contention has never been raised in this action. To advance it in a reply is improper. It should not be considered, but is treated to the extent of USF & G's response.

Lee contends that, "[b]ased on the uncontradicted evidence of the inadequacy of the UEF," the only way that the UEF could provide adequate compensation for Conley is by establishing "that there is coverage under the USF & G workers' compensation policy." Under California Labor Code § 5600, Lee asserts, "it is evident that the UEF's claim for coverage under the USF & G policy falls within the exclusive jurisdiction of the WCAB", citing *Rinaldi v. Workers' Compensation Appeals Bd.*, 196 Cal.App.3d 571, 242 Cal. Rptr. 895 (1987). Lee refers to *Aetna Casualty & Surety Co. v. Aceves, supra*, 233 Cal.App.3d at 554–555, 284 Cal.Rptr. 477:

A trial court has discretion whether or not to exercise an action for declaratory relief. Aceves contends that the trial court abused its discretion by taking jurisdiction in this case, because the court created the possibility of inconsistent judgments.

If an employer is found to be uninsured, an injured employee has certain rights to proceed against the Uninsured Employers Fund (Fund), which was set up to pay judgments obtained against uninsured employers. (Lab.Code, § 3715 et seq.) The Fund was not named in Aetna's suit, and the judgment in that suit therefore cannot bind the Fund ... Aceves asserts that the Fund might be able to demonstrate to the WCAB that Aetna *did* insure Chesler at the time of the accident. If so, the Fund would not be liable to Aceves, and Aceves would be left with an unenforceable judgment against Chesler.

Aetna does not directly respond to this argument. Instead, it contends that the superior court's final determination concerning insurance coverage would be binding on the *WCAB*. Aetna states that 'sound public policy [limits] litigation by preventing a party who has had one fair trial on an issue from again drawing it into controversy.' ... This proposition, although legally sound, does not respond to Aceves' argument. The WCAB is a decisionmaking forum, not a party to be bound by a prior judgment. The Fund, in contrast, is commonly joined as a party in cases involving controversies over insurance coverage of employers. As the court explained in *Rinaldi v. Workers' Comp. Appeals Bd.* (1987) 196 Cal.App.3d 571, 242 Cal.Rptr. 895 ..., 'Rinaldi, as the Director of the Department of Industrial Relations of the State of California, is the state official responsible for administering the Uninsured Employers Fund. The fund

was created to ensure that workers employed by illegally uninsured employers are not deprived of workers' compensation benefits (Lab.Code, § 3716, subd. (b)). *Rinaldi is aggrieved by the Board's order, for he is required to pay the award if the employer fails to do so.* (Lab.Code, § 3716, subd. (a)).' (*Id.* at p. 572, fn. 1, italics added.) Thus, although the declaratory judgment is conclusive as to Aceves, it cannot be binding on the Fund. (See *Scott, supra,* 46 Cal.2d at p. 83, 293 P.2d 18.)

Aetna contends that because Aceves agreed in the settlement agreement not to pursue any personal liability against Chesler in a workers' compensation proceeding, there was no realistic possibility of inconsistent judgments. Determination of this issue would require us to determine the interpretation of and enforceability of the settlement agreement. That issue was not presented for resolution in the trial court and is not properly before us on appeal. See, e.g., Labor Code section 5001, which states, 'No release of liability or compromise agreement is valid unless it is approved by the appeals board ....' ... The record contains no suggestion that such approval has been obtained.

The issue of possible inconsistent judgments was properly raised before the trial court, yet no measures were taken to lessen or avoid prejudice to Aceves ... A trial court's exercise of discretion under section 1061 will be upheld on appeal unless an abuse of discretion is clearly shown. The test of abuse of discretion is 'whether or not the trial court exceeded the bounds of reason, all of the circumstances before it being considered ...' ... Under the circumstances presented in this case, we conclude that the trial court did abuse its discretion in granting declaratory judgment when the Fund was not joined as a party.

Relying on *Aceves,* Lee argues that USF & G likewise failed to join the UEF and the UEF is not bound by the Partial Judgment:

> The risk of inconsistent judgments is likewise present between a judgment by this court that USF & G is entitled to rescind and to restitution as to Lee, and one by the WCAB in favor of the UEF that USF & G's policy was not rescinded and USF & G remains liable for Conley's workers' compensation benefits. Presumably, USF & G never joined the UEF to this action for fear that the UEF's involvement would cause the court to recognize that exclusive jurisdiction and the proper forum under the *Buford* and *Colorado River* abstention doctrines lay with the WCAB.

Judge Coyle's Order denying the motion to dismiss also denied Lee's request for abstention under *Buford* and *Colorado River.* Lee's reference in the reply brief is the first contention by Lee that the abstention rulings were in error.

■ In its sur-reply brief, USF & G contends that it "is simply outrageous and in bad faith that Lee would wait eight years after the case had been filed and after trial and in a Reply brief to its own motion to vacate to raise the completely new allegation that UEF was somehow a necessary party." USF & G notes that Lee never asserted this contention in its Answer to the Complaint or to USF & G's amended counterclaim. Lee has never raised the issue of UEF's alleged indispensability. It may not do so now, after the trial is over.

USF & G further contends that Lee is estopped from asserting that the UEF was a necessary party. Lee's Motion in Limine No. 19 (Doc. 449) and the Order granting Motion in Limine No. 19 (Doc. 596) ("There shall be no mention of and no documentary evidence or testimony before

the jury or prospective jurors relating to any collateral source of funds for the payment of benefits or damages to Ms. Conley, including, without limitation, the Uninsured Employer's Trust Fund ....."). USF & G notes that at the same time Lee moves to vacate the Partial Judgment because the UEF is a necessary party, Lee moves for a new trial on the grounds of counsel's misconduct in mentioning the UEF during questioning of Hugh Awtrey.

USF & G raises Rule 12 to rebut Lee's contention that the UEF is a necessary party on that ground is made too late. Fed. R. Civ. Proc. Rule 12(b)(7) is the means by which the defense of failure to join a party under Fed. R. Civ. Proc. Rule 19 is raised by motion. Rule 12(g) provides in pertinent part:

> ... If a party makes a motion under this rule but omits therefrom any defense or objection then available to the party which this rule permits to be raised by motion, the party shall not thereafter make a motion based on the defense or objection so omitted, except a motion as provided in subdivision (h)(2) hereof on any of the grounds there stated.

Rule 12(h)(2) provides in pertinent part:

> A ... defense of failure to join a party indispensable under Rule 19 ... may be made in any pleading permitted or ordered under Rule 7(a), or by motion for judgment on the pleadings, or at the trial on the merits.

Lee did none of these. USF & G further argues that *Aceves* does not establish that the Partial Judgment should be vacated pursuant to Rule 19, Federal Rules of Civil Procedure, because of the failure to join the UEF as a party. USF & G notes that in *Aceves,* the issue of inconsistent judgments was raised in the trial court, while Lee did not do so. USF & G contends that, in *Rinaldi,* the UEF had been named as a defendant by the applicant in

proceedings before the WCAB. That the case noted in passing that the UEF was an interested party, but did not hold or discuss whether the UEF was a necessary or indispensable party.

█ Finally, USF & G argues, the UEF was neither a necessary nor an indispensable party to USF & G's complaint for rescission, as California Labor Code § 3715(a) vests the right to name the UEF exclusively in the employee:

> Any employee ... whose employer has failed to secure the payment of compensation as required by this division ... may, in addition to proceeding against his or her employer by civil action in the courts as provided in § 3706, file his or her application with the appeals board for compensation and the appeals board shall hear and determine the application for compensation in like manner as in other claims and shall make the award to the claimant as he or she would be entitled to receive if the employer had secured the payment of compensation as required, and the employer shall pay the award in the manner and amount fixed thereby or shall furnish to the appeals board a bond, in any amount and with any sureties as the appeals board requires, to pay the employee the award in the manner and amount fixed thereby.

USF & G contends: "More importantly, the claim against the employee [sic] may only be made upon an *award* of the WCAB against the employer, an event which has not taken place." Only if the employer fails to pay the compensation awarded by the WCAB does the UEF pay the award. Labor Code § 3716(a) and *Symmar, Inc. v. Workers' Comp. Appeals Bd.,* 135 Cal. App.3d 65, 70–71, 185 Cal.Rptr. 67 (1982).

Lee's motion to vacate the partial judgment pursuant to Rule 60(b) on the ground that the WCAB had and has exclusive jurisdiction is DENIED. Lee's volumi-

nous briefs on this issue have been fully considered. Lee's essential arguments were unsuccessfully argued to Judge Coyle. Based on Judge Coyle's analysis and the arguments of USF & G and Aon in opposition to this motion, Judge Coyle's rulings were not contrary to law. Lee's failure to join in Conley's motion for reconsideration, the filing of Lee's counterclaim, and the failure to argue that UEF is a necessary party until the reply brief in support of this motion are persuasive factors that Lee has not established grounds to vacate the partial judgment pursuant to Rule 60(b).

2. *California Law Re an Insurer's Imposition of a Condition or Exception on a Workers' Compensation Policy Except by Means of an Approved Endorsement and Insurer's Termination Rights.*

■ Lee asserts that California law clearly requires that any limitation on a workers' compensation policy be by an approved form of endorsement to the policy, citing California Insurance Code §§ 11657, 11659, 11660 and 10 C.C.R. 2268.

Insurance Code § 11657 provides:

Subject to the provisions of Sections 11659 and 11660, limited workers' compensation policies may be issued insuring either the whole or any part of the liability of any employer for compensation, provided that the policy is previously approved, as to substance and form, by the commissioner. Subject to those provisions, the policy may restrict or limit the insurance in any manner whatsoever.

Insurance Code § 11659 provides:

Such approved form of policy, limited pursuant to Section 11657, shall not be otherwise limited except by indorsement thereon in accordance with a form prescribed by the commissioner or in accordance with rules adopted by the commis-

sioner. Such indorsement form shall not be subject to Section 11658. Before prescribing such indorsement form or adopting such rule, the commissioner shall consult concerning it with the Workers' Compensation Appeals Board.

Insurance Code § 11660 provides:

Failure to observe the requirements of Section 11657 and 11659 shall render a policy issued under Section 11657, and not complying therewith, unlimited.

10 C.C.R. § 2268 provides:

No collateral agreements modifying the obligation of either the insured or the insurer shall be made unless attached to and made a part of the policy, provided, however, that if such agreements are attached and in any way restrict or limit the coverage of the policy, they shall conform in all respects with these rules.

Lee refers to the trial testimony of Cathy Hacker, contending that Ms. Hacker testified that the requirement for Lee to assure underwriting that Lee would not do construction was a "condition" for the issuance of the policy:

Q. Oh. Now, when you had these—you had a discussion or—with Mr. Sackett and Mr. Sheehan about the possibility of a policy being issued through American Specialty as a USF & G Workers' Compensation policy. What was discussed in that conversation?

A. In order for us to write a USF & G policy for Workers' Compensation coverage, there were certain criteria that we needed before we could write that policy.

Q. What were the criteria discussed?

A. We needed a verification from the insured, Splash Island, in writing that their employees would no longer be performing construction work.

. . .

Q. And do you recall what Stan said about potentially issuing a USF & G policy to American Specialty to The Island for Workers' Compensation insurance?

A. My recollection is that he would consider writing it only on the condition that we had verification that Splash Island employees no longer performed any construction work.

(Trial testimony of Hacker, Feb. 2, 2007, 52:8–19, 55:16–21). Lee asserts that USF & G argued that Lee's August 12, 1998 letter to ASI clearly stated that certain activities would not be performed and thus constituted an exception to the policy coverage and a limitation thereon. Lee contends that, as such, the limitation was required to be set forth in the policy and to comply with the above cited California Insurance Code provisions.

USF & G asserts that Lee continues to disregard the issues that were tried and applicable California law by arguing that the August 12, 1998 letter to ASI constituted an "endorsement or exclusion" to its policy of insurance. USF & G has consistently maintained its workers' compensation policy was complete, fully integrated and unrestricted and has never asserted that the August 11 and 12, 1998 letters modified the coverage in the policies. USF & G asserts that Lee's contention that USF & G argued that Lee's August 12, 1998 letter to ASI clearly stated that certain activities would not be performed and thus constituted an exception to the policy coverage and a limitation thereon is "simply *not true:*"

The central issue in this case, as asserted by USF & G, was that Lee made material misrepresentations and omissions in the policy application process, not that there was any limitation in coverage.

USF & G also argues that Lee's reliance on the testimony of Cathy Hacker that Lee's false representations in its August 12, 1998 letter constituted a restriction or condition on the policy is totally unfounded:

Ms. Hacker did *not* testify that construction work would not be covered or that the policy contained a condition that it would not cover construction work. Rather, her testimony clearly states that USF & G would not write the policy *in the first place* if Lee was going to perform construction work.

Lee replies that Cathy Hacker's testimony established that Mr. Sackett's August 11, 1998 letter stated a condition or exception to coverage under the policy. In addition to the testimony quoted above, Lee refers to other testimony by Cathy Hacker:

Q. And what was discussed in that meeting?

A. We discussed receipt of the letter [Christy Platt's August 12, 1998 letter] promising that they would no longer employ construction laborers and our considering quoting it under USF & G.

. . .

Q. All right. So rather that issuing an exclusionary endorsement, Mr. Sackett sent this August 11, 1998 letter to Aon in place of an exclusionary endorsement?

A. No.

Q. Well, the letter was serving as stating USF & G's condition for providing insurance, was it not?

A. Yes.

(Trial testimony of Hacker, Feb. 2, 2007, 73:22–25; Feb. 6, 2007, 132:4–10). Lee argues:

This was not a mere request for information: it sought the agreement of Lee to a condition and restriction that its employees would not engage in construction and that claims arising from

construction would not be reported under the policy. Such activities were exceptions to the coverage otherwise provided by the policy. As such, Mr. Sackett's August 11, 1998 letter was required to be clear, plain and conspicuous, but it was not. USF & G and ASI claimed that any kind of construction was precluded, but the letter stated that Lee employees were to stay within their water park classifications, and 'construction' as used in the letter could reasonably be interpreted not to include construction activities that were water park maintenance within the meaning of water park classification codes 9016 and 9180, and to include only 'construction' activities that were outside of the water park classifications and would require a workers' compensation construction classification code.

Lee contends that, contrary to USF & G's contention, there was ample evidence that the latter interpretation was the actual agreement of the parties, referring to Dr. Levine's testimony that insurance industry personnel would be expected to understand "construction" in the latter sense (Trial testimony of Levine, Feb. 14, 2007, pp. 41–49) and Christy Platt's deposition testimony read at trial that "at the time I wrote this letter, as is the same as is my current understanding as it relates to water parks, is my perception of construction laborers are crews brought in to build the water park from the ground up." (Trial testimony of Platt, Feb. 14, 2007, 21:5–9).

Lee further argues that, given the requirements of Insurance Code §§ 11657, 11659 and 11660 and the express statutory requirements for cancellation of a workers' compensation policy set forth in Insurance Code § 676.8, as a matter of California public policy, a workers' compensation policy cannot be rescinded and can only be terminated in accordance with Section 676.8.

Insurance Code § 676.8 provides:

(a) This section applies only to policies of workers' compensation insurance.

(b) After a policy is in effect, no notice of cancellation shall be effective unless it complies with the notice requirements of this section and is based upon the occurrence, after the effective date of the policy, of one or more of the following:

(1) The policyholder's failure to make any workers' compensation insurance premium payment when due.

(2) The policyholder's failure to report payroll, to permit the insurer to audit payroll as required by the terms of the policy or of a previous policy issued by the insurer, or to pay any additional premium as a result of an audit of payroll as required by the terms of the policy or of a previous policy.

(3) The policy holder's material failure to comply with federal or state safety orders or written recommendations of the insurer's designated loss control representative.

(4) A material change in ownership or any change in the policyholder's business or operations that materially increases the hazard for frequency of severity of loss, requires additional or different classifications for premium calculations, or contemplates an activity excluded by the insurer's reinsurance treaties.

(5) Material misrepresentation by the policyholder or its agent.

(6) Failure to cooperate with the insurer in the insurer's investigation of a claim.

(c) A policy shall not be canceled for the conditions specified in paragraph (1), (2), (5), or (6) of subdivision (b) except upon 10 days' written notice to the policyholder by the insured ... If the policyholder remedies the condition to the insurer's satisfaction within the specified time pe-

riod, the policy shall not be canceled by the insurer.

USF & G responds that Lee's contention that a workers' compensation policy cannot be rescinded as a matter of California public policy is wrong. USF & G cites *Mitchell v. United National Ins. Co.,* 127 Cal.App.4th 457, 468, 25 Cal.Rptr.3d 627 (2005) and Insurance Code §§ 331 ("Concealment, whether intentional or unintentional, entitles the injured party to rescind insurance") and 359 ("If a representation is false in a material point, whether affirmative or promissory, the injured party is entitled to rescind the contract from the time the representation becomes false"). USF & G contends that there is no limitation in those provisions or under California law barring a claim for rescission of a workers' compensation insurance policy.

In reply, Lee notes that USF & G does not specifically discuss Section 676.8 and contends that "it is axiomatic that the more specific sections of the Insurance Code on Workers' Compensation should control over these general sections", i.e., Sections 331 and 359. Lee also asserts that no case is cited by USF & G that addresses whether a workers' compensation policy can be rescinded or may only be canceled prospectively.

Lee has not previously asserted Section 676.8 and cites no case authority to support its position. California law does not bar the remedy of rescission of a workers' comp policy as between the insurer (USF & G) and policyholder (Lee).

Lee's motion to vacate the partial judgment or to alter or amend the partial judgment on this ground is DENIED.

3. *As a Condition or Exception Limiting Coverage, Mr. Sackett's August 11, 1998 Letter Was Not Clear, Plain and Conspicuous.*

■ Lee asserts that the August 11, 1998 letter "stated what USF & G claims was a condition on coverage that Lee's employees (a) stay within their designated classification as water park employees and (b) that claims arising from 'construction' not be reported under the workers' compensation policy:"

> USF & G and ASI never made clear to Lee what was and was not included within the designated classification for water park employees, nor did USF & G and ASI inform Lee that they were interpreting 'construction' in a layperson's terms instead of in the sense that would require a construction classification code under the Uniform Statistical Reporting Plan. Dr. Levine established that 'designated classification' and 'construction' in this context would be understood by persons in the insurance industry in their technical sense, but USF & G claimed that any activity that a layperson could call construction was impermissible. This was never clarified for Lee, which, like Mr. Lemasters, understood it was not unusual for water park maintenance employees to erect water slides as part of park operations.

Lee asserts that, because USF & G and ASI were not clear, plain and conspicuous in their statement of condition or exception to the policy, that condition or exception cannot be enforced. Lee cites *Thompson v. Occidental Life Insurance Co.,* 9 Cal.3d 904, 912, 109 Cal.Rptr. 473, 513 P.2d 353 (1973):

> [A]n insurance company is not precluded from imposing conditions precedent to the effectiveness of insurance coverage despite the advance payment of premium. However, any such condition must be stated in conspicuous, unambiguous and unequivocal language which an ordinary layman can understand.

Lee also cites *E.M.M.I., Inc. v. Zurich American Ins. Co.,* 32 Cal.4th 465, 471, 9 Cal.Rptr.3d 701, 84 P.3d 385 (2004):

As we have declared time and again, 'any exception to the performance of the basic underlying obligation must be so stated as clearly to apprise the insured of its effect.' Thus, 'the burden rests upon the insurer to phrase exceptions and exclusions in clear and unmistakable language.' The exclusionary clause 'must be conspicuous, plain and clear.' This rule applies with particular force when the coverage portion of the insurance policy would lead an insured to reasonably expect coverage for the claim purportedly excluded.

Lee's contention assumes that the August 11, 1998 letter imposed a condition or restriction on coverage. This presented, in part, a question of fact as to the parties' intent which was decided against Lee.

As USF & G responds, Lee's contention that the August 11, 1998 letter constituted a condition modifying the terms of an integrated policy is "completely unfounded as a matter of law". The August 11, 1998 letter was not part of the insurance policy and did not constitute a condition or exclusion. The cases upon which Lee relies discuss rules for the interpretation of an insurance policy and, not, as here, statements made by the applicant prior to the written and fully integrated policy contract being formed. As USF & G contends:

> Sackett's August 11, 1998 letter ... clearly was not part of the policy. Rather, it constituted only a request by the insurer in the course of the policy application process for confirmation that Lee would not use its employees to perform construction work. That inquiry was made to allow USF & G and American Specialty to determine whether they would be willing to issue the policy in the first place.

Furthermore, Lee, over the objections of USF & G, requested and Jury Instruction No. 29 was given:

If you find that USF & G imposed any condition to its issuance of the workers' compensation policy to Lee, you should determine if any language of such condition is uncertain or ambiguous. If you find that the language of any condition to the issuance of the workers' compensation policy is uncertain or ambiguous, you should consider the language it its narrowest sense.

(Doc. 661, p. 30). Therefore, the jury considered Lee's argument that USF & G was imposing a condition in the workers' compensation policy, that such condition should be interpreted in its narrowest sense, and the jury rejected Lee's position.

■ Lee's assertion that Jury Instruction No. 29, given at trial, is of "no moment" because the issue of whether the condition was clear, plain and conspicuous is a question of law, is without merit. The case upon which Lee relies, *20th Century Ins. Co. v. Liberty Mut. Ins. Co.*, 965 F.2d 747, 753 (9th Cir.1992), does not so hold. Further, because Lee requested and obtained Jury Instruction No. 29, the doctrine of invited error precludes Lee's motion on this ground. *See Deland v. Old Republic Life Insurance Company*, 758 F.2d 1331, 1336–1337 (9th Cir.1985).

Lee's motion on this ground is DENIED.

4. *Admissibility of Christy Platt's August 12, 1998 Letter to Mr. Sackett and Related Communications.*

■ Lee asserts that, in addition to the requirement of California law that all limitations on a workers' compensation policy be in the policy, Lee's August 12, 1998 letter and related communications should have been excluded from evidence under the parol evidence rule. Lee argues:

> Because USF & G had conditioned coverage on Lee's employees staying within their designated classification as water

park employees and not having workers' compensation claims arise from 'construction,' Lee's August 12, 1998 letter to Mr. Sackett, as interpreted by USF & G, was not independent of, but related directly to and contradicted the terms of the policy. The policy expressly covered activities of Lee's employees that were within a water park classification code. Lee's August 12, 1998 letter, as interpreted by USF & G, contradicted the policy in stating that Lee's employee would not do activities that were within a water park classification and that a layperson might view as construction. As such, Lee's August 12, 1998 ... letter should have been excluded under the parol evidence rule as should have the August 11, 1998 ... letter from Mr. Sackett to Mr. Hildebrand, the August 27, 1998 letter from Mr. Awtrey and Ms. Moore to Christy Platt ... and related oral communications.

Lee asserts that, without these letters and communications, there would be no basis for a claim of any alleged misrepresentation or concealment.

Lee has *twice* before argued this issue unsuccessfully. By Order filed on July 30, 2004 (Doc. 194, pp. 55–58), Judge Coyle denied Lee's motion for summary judgment on this ground, ruling in pertinent part:

Lee further moves for summary judgment with respect to Fidelity's claim for rescission on the ground that Lee's letter of August 12, 1998 is inadmissible as a matter of law to prove any fact contradicting the express terms of the integrated Policy.

In arguing that this August 12, 1998 letter is inadmissible, Lee cites *Bank of America v. Pendergrass,* 4 Cal.2d 258, 263–264, 48 P.2d 659 (1935).

At issue in *Pendergrass* was the admission of 49 evidence of a promise that if the appellant executed a note and mort-

gage, the appellant would not be required to make any payments of interest or principal for a year. In holding that this evidence was inadmissible, the Supreme Court stated:

[I]t is manifest that the promise which it is claimed they relied upon was ... that the respondent would 'extend' or 'postpone' all payments for the period of one year. This promise is in direct contravention of the unconditional promise contained in the note to pay the money on demand. The question then is: Is such a promise the subject of parol proof for the purpose of establishing fraud as a defense to the action or by way of cancelling the note, assuming, of course, that it can be properly coupled with proof that it was made without any intention of performing it? Our conception of the rule which permits parol evidence of fraud to establish the invalidity of the instrument is that it must tend to establish some independent fact or representation, some fraud in the procurement of the instrument, or some breach of confidence concerning its use, and not a promise directly at variance with the promise of the writing ... *Lindemann v. Goryell* ... confirms the opinion we entertain, for while it is said no question of fraud was raised, yet the effort was made to prove that the note was executed upon the understanding that the payee would not enforce payment until the payor had sold sufficient real estate to enable him to pay. It was there said ... that fraud may not be established by parol evidence to contradict the terms of the writing 'when the statements relate to rights depending upon contracts yet to be made, to which the person complaining is a party, as under such circumstances he has it in his power to guard in advance against any

and all consequences of a subsequent change of conduct by the person with whom he is dealing, and to admit evidence of extrinsic agreements would be to open the door to all evils that the parol evidence rule was designed to prevent.' . . . .

See also Bank of America v. Lamb Finance Co., 179 Cal.App.2d 498, 502, 3 Cal.Rptr. 877 (1960):

A distinction has been made by our courts in cases in which the fraud sought to be proved consists of a false promise. They have held that if, to induce one to enter into an agreement, a party makes an independent promise without intention of performing it, this separate false promise constitutes fraud which may be proven to nullify the main agreement; but if the false promise relates to the matter covered by the main agreement and contradicts or varies the terms thereof, any evidence of the false promise directly violates the parol evidence rule and is inadmissible.

See also Continental Airlines, Inc. v. McDonnell Douglas Corp., 216 Cal. App.3d 388, 419, 264 Cal.Rptr. 779 (1989):

But the fraud exception is not applicable where 'promissory fraud' is alleged, unless the false promise is independent of or consistent with the written instrument ... It does not apply where ... parol evidence is offered to show a fraudulent promise directly at variance with the terms of the written agreement.

Relying on these legal principals, Lee argues in pertinent part as follows:

USF & G contends that it issued the workers' compensation policy at issue in this case on USF & G's understanding and agreement that the policy would not cover or insure any employees performing 'construction' at the water park. According to USF & G, this was an indispensable part and integral condition of issuing the USF & G policy. However, this contention is directly at odds with and contradicts the unrestricted, integrated and auditable policy, written, assembled, reviewed and approved by American Specialty for USF & G. This very policy contains not one, but two, integration provisions and purports to fully describe the entire relationship and all obligations of the parties. The policy, which by its very terms is unlimited and unrestricted as to employees and occupations covered, directly contradicts USF & G's contention that it issued the policy premised upon the condition that construction workers would not be covered under the policy. Consequently, the August 11 and 12th letters are inadmissible and cannot provide grounds for rescission of the USF & G policy.

Fidelity takes issue with Lee's assertion that Fidelity "issued the policy premised upon the condition that construction workers would not be covered under the policy". Fidelity's position is that it issued the unrestricted policy based on Lee's representation that Lee would not be employing any construction workers. Furthermore, Fidelity argues that parol evidence is admissible to prove fraud in the inducement of a contract notwithstanding an integration clause. See Ron Greenspan Volkswagen, Inc. v. Ford Motor Land Development Corp., 32 Cal. App.4th 985, 995, 38 Cal.Rptr.2d 783 (1995); Airs, Inc. v. Perfect Scents, Ltd., 902 F.Supp. 1141, 1145–1147 (N.D.Cal. 1993).

Lee responds that Fidelity's reliance on these cases is misplaced because this exception to the parol evidence rule does not apply where the evidence in question concerns a matter covered by the main

agreement which contradicts the terms of the agreement.

The court does not agree with Lee. Fidelity's position is that Lee's misrepresentations that it would not employ construction workers caused Fidelity to issue an unrestricted policy and that Fidelity would not have done so (or would not have issued any policy at all to Lee) in the absence of that misrepresentation. This misrepresentation is a separate "false promise" that is not directly at variance with the terms of the contract. In other words, Lee "promised" that it would not employ construction workers and based on that promise Fidelity issued a policy covering all of Lee's employees. That Conley was employed as a construction worker is not at variance with the policy because the policy terms apply to Lee's employees but it is at variance with Lee's "promise" that it would not employ construction workers. Therefore, the court rules that August 11, 1998 memorandum from Mr. Sackett of American Specialty to Mr. Hildebrand of AON and the August 12, 1998 letter from Ms. Platt to American Specialty are admissible.

In addition, Lee's motion in limine no. 16 (Doc. 446) was "denied without prejudice to Lee submitting a jury instruction that the August 1998 letters may not be considered or used to contradict or vary the integrated insurance policy insofar as that policy insured water park classification codes." (Doc. 596, p. 7).

As USF & G asserts, Lee's contention that the letters modified or varied the terms of the policy was not urged or argued by any party in the case:

It was undisputed that the USF & G policy was complete, fully integrated and unrestricted. USF & G never asserted that the August 12, 1998 letter, or the August 11, 1998 letter which preceded it, modified the coverage under the policy. Rather, the central issue in the case was whether Lee made misrepresentations or material omissions in the policy application process. Further, no one argued that the classification codes listed in the policy limited the coverage of employees. Neither Mr. Awtrey, who drafted the August 12, 1998 letter, nor Christy Platt, who signed it, testified that either had any special interpretation of the term 'construction,' limiting it to employees requiring separate classifications under workers' compensation premium determination provisions.

As USF & G further asserts, Lee's contention that the August 1998 letters should be excluded under the parol evidence rule "requires an extreme mischaracterization of USF & G's position":

Lee contended that USF & G wished to introduce the August letters as evidence that the policy excluded construction laborers. In fact, USF & G *never* argued that the policy did not cover construction laborers. USF & G agreed that the policy was unrestricted and covered *all* of Lee's employees. Moreover, the August letters do not discuss any change to the terms of the policies. Rather, such letters were intended to address American Specialty's concern that Lee's employees were performing construction work. Lee's theory would eliminate any cause of action for fraudulent inducement. Under Lee's theory, a party could lie and cheat to induce another party to enter a contract and such lies would be excluded under the parol evidence rule.

Finally, Lee's contention that the August 27, 1998 letter from its own broker, Aon, to Lee should be excluded under the parol evidence rule, is even more farfetched. No one has contended that that letter modified the terms of the

contract of insurance. Nor has Lee explained how anyone could even contend that its own broker was able to modify the terms of a previously issued fully integrated policy of an independent insurer.

Lee replies that these letters and communications are subject to the parol evidence rule:

As an integrated policy, the policy clearly provided coverage for 'construction' or 'construction-related' activities that fell within a water park classification. However, USF & G's and ASI's interpretation of 'construction' precludes those activities and as such the August 12, 1998 letter and related communications were at direct variance with the provisions of the policy. It is patently absurd for USF & G and ASI to take the position that the subject policy covered construction laborers ..., but if Lee employed construction laborers the policy would be void *in abnitio.*

These issues were thoroughly exhausted before trial through motions in limine and at trial, by rulings on jury instructions. The jury was correctly instructed that they could consider Lee's words and conduct as bearing on its fraudulent intent and inducement to obtain the policy. The jury was further instructed they could not consider the words and conduct to vary the terms of the insurance policy. The motion on this ground is DENIED.

5. *Whether An Application for the Subject Insurance Was Required.*

▉ Lee argues that, as a matter of law, an application for the workers' compensation policy was required in this case as an element of the claim for rescission.

Lee relies on the testimony during its cross-examination of Stanley Sheehan, an underwriter for ASI:

Q. In the course of doing underwriting, American Specialty reviewed applications; is that correct?

A. Yes, American Specialty reviews applications as a part of underwriting.

Q. And as a matter of policy and procedures, did you request a signed application?

A. A signed application is requested as part of the procedure.

Q. And that was true in 1998; correct?

A. Yes. That was true in 1998.

(Testimony of Sheehan, Feb. 7, 2007, 16:20–17:4).

Lee argues that this testimony establishes that an application for insurance by USF & G is an element of a claim for rescission. Citing CACI Instruction 2308, "Rescission for Misrepresentation or Concealment in Insurance Application—Essential Factual Elements", includes in the elements of the claim the following:

1. That [*name of insured*] submitted an application for insurance with [*name of insurer*];

2. That in the application for insurance [*name of insured*] [intentionally] [failed to state/represented] that [*insert omission or alleged misrepresentation*] ....

Lee contends that Lee never submitted an application for insurance with USF & G. Rather, Lee asserts:

American Specialty pieced together information from various outdated and incomplete sources to write the policy, including an unsigned application for insurance with Industrial Indemnity. The original application was in substantial conflict with other information American Specialty had within its Lee file, including, without limitation, another supplemental application submitted by Dibudio & DeFendis which clearly indicated Lee's intent to construct and erect new slides with its employees. USF & G

now seeks to rescind based on Lee's alleged misrepresentations regarding the nature and scope of Lee's employees work as it relates to assembling an unfinished water slide.

Lee contends:

Evidence was introduced at trial that the formality of the application puts the applicant on notice that the information provided will be used to determine whether to issue a policy. Here, the application, and the protections inherent to the applicant therein, were missing. This missing instruction on the element of an application clearly prejudiced Lee and lead to an unfavorable result.

USF & G responds that Lee's position is incorrect as a matter of California law, contending that the provisions of California law governing the right to rescission under the California Insurance Code and case law impose no "requirement" of a formal application.

USF & G cites *Mitchell v. United National Ins. Co.*, 127 Cal.App.4th 457, 467–469, 25 Cal.Rptr.3d 627 (2005):

United National based its right to rescind the policy on Insurance Code sections 331 and 359. Insurance Code section 331 states: 'Concealment, whether intentional or unintentional, entitles the injured party to rescind insurance.' Insurance Code section 359 similarly provides: 'If a representation is false in a material point, whether affirmative or promissory, the injured party is entitled to rescind the contract from the time the representation becomes false.'

Insurance Code sections 331 and 359 are part of a larger statutory framework that imposes 'heavy burdens of disclosure' 'upon both parties to a contract of insurance, and any material misrepresentation or the failure, whether intentional or unintentional, to provide requested information permits rescission of the policy by the injured party.' *Im-*

*perial Casualty & Indemnity Co. v. Sogomonian* (1988) 198 Cal.App.3d 169, 179–180, 243 Cal.Rptr. 639 ... Insurance Code section 332, for example, requires each party to an insurance contract to disclose, 'in good faith, all facts within his knowledge which are or which he believes to be material to the contract ...' The disclosure obligations imposed by these statutes are directed specifically at the formation of the insurance contract. Insurance Code section 334 states: 'Materiality is to be determined not by the event, but solely by the probable and reasonable influence of the facts upon the party to whom communication is due, in forming his estimate of the disadvantages of the *proposed contract,* or in making his inquiries.' (Ins. Code, § 334, italics added.) Insurance Code section 356 provides: "The completion of the contract of insurance is the time to which a misrepresentation must be presumed to refer."

Requiring full disclosure at the inception of the insurance contract and granting a statutory right to rescind based on concealment or material misrepresentation at that time safeguard the parties' freedom to contract. '[An insurance company] has the unquestioned right to select those whom it will insure and to rely upon him who would be insured for such information as it desires as a basis for its determination to the end that a wise discrimination may be exercised in selecting its risks.' ....

USF & G contends that none of these Insurance Code provisions require an "application" before a contract of insurance may be rescinded because of an insured's misrepresentation or concealment.

USF & G further argues that Sheehan's testimony that a signed application may be requested by American Specialty during the underwriting process is irrelevant.

USF & G refers to Sheehan's testimony that an unsigned application is often accepted from an existing insured-customer. USF & G also refers to Hugh Awtrey's trial testimony that signed applications are usually not required as part of the underwriting process:

Q. Let's go down to the bottom of the page, please. This application was not signed; is that correct?

A. That is correct.

. . .

THE COURT: Is there some reason for that?

THE WITNESS: Unless companies require signatures, we generally don't have signatures of apps. If they come back at the time of binding, sometimes I will come back and say before we bind coverage, we will need a signature, but otherwise, policies are done over the phone and we submit it and it's written without a signature.

There are certain types of policies where I might come back and say we need a signature. Workers' Compensation, there is generally never signatures on applications.

(Testimony of Awtrey, Feb. 8, 2007, 170:7–20). USF & G also refers to the trial testimony of expert, Bennett Bibel, that an underwriter can use any form of documentation in making an underwriting decision:

Q. Do some workers' comp insurers make determinations whether to issue policies to particular applicants based solely on this standard Acord application?

A. I would have to say that's the norm. The normal circumstance. In most circumstances, the Acord application, which was developed by the insurance industry, answers or asks the questions that an underwriter needs to write.

Q. Okay. Is there some guideline as to what an underwriter has to have in or-

der to write—to decide to write a workers' compensation insurance policy?

A. At the risk of being facetious, he needs a contract to have the pen in order to be able to have the authority to write. Underwriting is an art as well as a science. And underwriters have wide latitude in the process of accepting or declining a given risk. And an underwriter on a given day may ask for something, another day he may not ask for it. It depends on how much he knows about the nature of a particular risk and who is submitting it.

(Testimony of Bibel, Feb. 17, 2007, 38:4–21).

USF & G further asserts as without merit Lee's contention that it was prejudiced because the "formality" of the application would have placed Lee on notice that the information provided would be used to determine whether to issue the policy:

As a matter of fact, Lee's broker, Aon, obviously was aware that the information it was providing to American Specialty in the August 12, 1998 letter, which it drafted, would be utilized to determine whether to issue the policy.

In its reply brief, Lee asserts that USF & G previously cited *Cohen v. Penn Mut. Life Ins. Co.*, 48 Cal.2d 720, 726, 312 P.2d 241 (1957), for the proposition that the fact the insurer asked specific questions on the application makes the answers material as a matter of law. Lee asserts that it previously argued that, without a corresponding request for certain information on the application, the information is presumed immaterial, citing *Reserve Ins. Co. v. Apps*, 85 Cal.App.3d 228, 231, 149 Cal.Rptr. 223 (1978) and *Ashley v. American Mut. Liab. Ins. Co.*, 167 F.Supp. 125, 132 (N.D.Cal. 1958). Therefore, Lee argues, the application itself is such an important and necessary document that it may be used to

prove or disprove the element of materiality. Lee argues that the issue of an application and the presence of it was key to show the absence of fraud and the lack of a misrepresentation:

As set forth in the cases above, the application gives notice to the applicant that the information sought is important. Along with this, is the assumption that the applicant will see and review the application, see the questions asked, review the questions with either the insurer or the applicant's broker, and thus be informed of what the insurer wants to know and also to know that the information is sought for the purposes of an underwriting determination. All of these factors are the reasons for the importance, and necessity of an application. This is supported by the CACI instruction ... which lists an application as the first element of a claim for rescission.

At trial, USF & G failed to establish the existence of an application. This is not surprising because USF & G was unable to meet this element. In the present case, two separate applications were filled out on Lee's behalf prior to the cancellation of the original policy issued by Industrial Indemnity. Neither were signed by Lee. The most recent application, and not surprisingly, the one not completed by Aon, clearly answered the question regarding whether the employees were building or erecting slides in the affirmative! The unequivocal testimony at trial was that this application was in the Lee file at ASI when the USF & G policy was issued. ASI testified that it reviewed the file in determining whether to issue the USF & G policy. Accordingly, it was uncontroverted that on this earlier application Lee informed ASI that it intended to perform acts that USF & G would later construe as construction.

Moreover, Lee was not provided another 'fresh' application despite the change in circumstances and experience of Lee in operating the park. Lee knew what remained to be completed (the red slide) and that it intended, as long as Bruce Calomiris was a part of the operation, that Lee would maintain all the slides and might assemble the red slide if it was completed. On the other hand, Lee did not know the contents of the August 11, 1998 letter. Thus, Lee did not have sufficient notice of information which should have been in the application.

Lee contends that the Partial Judgment must be vacated, altered and/or amended for failure to decide this allegedly essential issue.

Lee's position is without merit, spurious, and ignores the reality of the transaction. A contract of insurance was issued to Lee by USF & G based on USF & G's specific request for Lee's truthful assurances that Lee would not perform construction activities or utilize construction workers. It was known to all parties that Lee's prior policy was cancelled because its workers were performing construction activities. The evidence was undisputed that ASI was Lee's insurance agent of record for the workers' compensation policy, not DiBuduo & DeFendis. ASI had obtained the prior policy from II for Lee. Lee instructed ASI to find and obtain new coverage after Lee's II workers' compensation policy was cancelled. Lee's position would sanction fraud and misconduct by Lee and bar USF & G from rescinding that policy no matter what the circumstances, merely because an application was not completed and signed by Lee. The established course of dealing between Lee and Aon explains fully how the USF & G insurance policy came into force after the Industrial Indemnity policy was cancelled, without a fully completed formal written application. Lee purposefully ignores the well-established

practice of brokers binding insurance coverage for existing clients without a new written application.

Lee's arguments concerning the importance of the application pertain to materiality, were made to and rejected by the jury on the issue of liability. There was no failure of proof on an essential issue. Lee's arguments concerning the importance of the application pertain to materiality and weight of evidence, rather than failure of proof on an essential issue. Lee's arguments were all presented to the jury on the issue of liability. The jury overwhelmingly found Lee's actions to be permeated with deceit and decided accordingly.

Lee's motion to alter or amend or to vacate the partial judgment on this ground is DENIED.

6. *Whether USF & G Failed to Show Lee's Employees Engaged in Activities Outside of a Water Park Classification.*

Lee asserts that USF & G reported Ms. Conley's accident to the Workers' Compensation Insurance Rating Bureau (WCIRB) as occurring under classification code 9016, as was made clear by Master Stat Report Facsimile (Ex. 675). Lee asserts that there was no evidence that Ms. Conley's injury was ever classified by USF & G or the WCIRB as occurring under any other classification code. Lee contends:

> This admission by USF & G proves that Ms. Conley was working within waterpark [sic] classifications in accordance with Mr. Sackett's August 11, 1998 letter to Hildebrand (Exh. 833) and Ms. Platt's August 12 letter (Exh. 374).

> Clearly, Lee's August 12 letter which USF & G claims serves as the basis for Lee's misrepresentation notified USF & G that Lee employees' 'duties would be limited to park operations.' (Exh. 374.)

Classifications 9016 and 9180 were the only code classifications that were pertinent to the water park operations in issue. Accordingly, the great weigh of the evidence, and indeed the only evidence, was that Ms. Conley was injured in the course of her employment with Lee while conducting tasks that were clearly 'park operations.'

USF & G argues that Ms. Conley's classification in the Master Stat Report Facsimile is not an admission by USF & G. First, there was no evidence at trial as to who made the report to the WCIRB or whether the source of the information for the report was anything other than the report of injury filed by Lee.

Second, USF & G maintains the insurer was required to report injuries to the WCIRB using only the classification codes set forth in the policy. USF & G refers to the trial testimony of Lee's workers' compensation expert, Dr. Arthur J. Levine:

Q. It says under No. C, 'Report the standard classification code to which the claim has been assigned. No claims can be assigned any standard classifications, unless payroll or other appropriate exposure also has been reported for the standard classification.'

So you have to—if you are going to make a report on the Unit Stat Report, it has to be for a classification that's in the existing policy; is that right?

A. Yes, unless the insurance company tells the Bureau that they think the classification should be added or changed.

. . .

THE COURT: At the time of an injury, the insurer reports to the Board under the classifications that are in the policy. And unless there is a change to those classifications in the policy by endorsement or some other means, then those

are the classifications used for reporting?

THE WITNESS: Right. It's a control mechanism. The Bureau does not—if something is going on in a classification that isn't in the policy, the Bureau needs to know about it. They can't just have insurance companies assigning claims to classes that aren't on there.

(Testimony of Levine, Feb. 14, 2007, 56:11–20, 57:24–58:8).

From this, USF & G contends that when Ms. Conley was injured, her injury was reported to the WCIRB under the classifications actually contained in the USF & G policy, as an amusement park maintenance worker, classification 9016:

The injury was reported as required by law, and the manner in which it was reported was not an admission that construction classifications come within the scope of an amusement park operations employee.

Second, USF & G contends, by the time the classification was reported, USF & G had filed its lawsuit for rescission. In this lawsuit USF & G unequivocally contended that the work Ms. Conley performed was a construction activity. Therefore, even if, *arguendo,* the Master Stat Report Facsimile could be viewed an "admission," there was contrary evidence which the jury could and did consider by expressly finding that there was no waiver or estoppel by USF & G based on all the evidence.

Lee replies that USF & G misleads the Court concerning its admission because "USF & G fails to remind the Court that the only expert testimony concerning the Master Unit Stat Report was that the purpose was to accurately report injuries." Lee contends that further testimony by Dr. Levine established that although the reporting party must initially report under an existing classification, the reporting party has a continuing duty to revise the classifications and amend the Master Unit Stat Report so that it accurately reported the classification under which the injury occurred:

Q. Now, by custom and practice in the insurance industry, is the carrier's assignment of the 9016 classification code to an accident on this Master Unit Statistical Facsimile relied on as accurate?

MR. SMYTH: Objection, no foundation.

THE COURT: Lay the foundation. Sustained.

. . .

Q. Dr. Levine, do you know what use is made of the reported classification code for the injuries that employees suffer on the job?

A. Yes, I do.

. . .

Q. What use is made?

A. The two uses I just mentioned. The first is rate-making by the Rating Bureau, and the second is Experience Modification Determination by the Rating Bureau for the individual employer.

Q. And to your knowledge, by custom and practice, is an insurance company required to report accurately what classification code applies?

A. Yes. If they don't, then it contaminates or subverts the whole rating basis as well as gives the employer a potential advantage or disadvantage in their Experience Modification competing with other competitors in the industry.

. . .

The Rating Bureau is, first and foremost, a rating organization, and it takes tremendous pains and is extremely concerned about the, let's call it 'purity', or accuracy, of its database.

In many of the meetings I attend, the president of the Rating Bureau comments that a proposed rule change or a particular procedure will have an impact

or won't have an impact on the credibility and accuracy of the database.

There is probably nothing that they are more concerned about than making sure that this information is properly reported and accumulated because is it's not right, then they are not giving the right results to the Insurance Commissioner, and their own members, the insurance companies, are using data that's skewed. So both for their own self-interest and for their role for the Insurance Commissioner, they want to get it right.

(Testimony of Levine, Feb. 14, 2007, 35:8–37:10)

Relying on this testimony, Lee asserts that "this" was ultimately USF & G's responsibility and that the reporting occurred after the rescission action was filed "only makes the admission more egregious [and] does not ... excuse USF & G from its admission."

Third, USF & G contends, whether Ms. Conley's work could be covered by a construction code is irrelevant:

USF & G asserted in argument and during the case that the issue was whether Lee's employees, not just Ms. Conley, would be performing *construction work,* as that term was normally interpreted using common language. The jury could and did reject Lee's hypertechnical interpretation of the August 12 letter as referring only to work requiring a separate classification under a construction code. More importantly, none of the parties who participated in the drafting of the August 12, 1998 letter, Hugh Awtrey and Christy Platt, testified to any understanding of a 'special meaning' of construction work different than its common meaning. Finally, as testified by Bennett Bibel, even if construction work were such performed [sic] normally by a water park employee, it still had to be separately classified under the WCIRB if it constituted new

*construction.* Testimony of Bennett Bibel, February 13, 2007 at 63:13–22 ... It was clear and undisputed that the water slide on which Conley was injured was a completely new slide under original construction.

Lee contends that the testimony of Lee's workers' compensation expert, Arthur Levine, confirms that Ms. Conley was performing park operations when she was injured. Lee asserts that Dr. Levine "is one of the preeminent experts on California Workers' Compensation Insurance, arguably one of the most knowledgeable outside the actual workers' compensation administration", that he has authored a book and taught classes on workers' compensation and liability insurance, and has served as the attorney for the Public Members of the Governing Committee on the Workers' Compensation Insurance Rating Bureau. Lee asserts:

Dr. Levine testified that work performed by Ms. Conley during the time of her injury, and any construction-related activity performed by Ms. Conley or Mr. Calomiris after the park opened for business was considered to be part of park operations and as such, it was covered under the water park classification codes 9016 or 9180. This evidence was unrebutted by other expert testimony. This evidence cannot be disregarded absent contradicting expert testimony. Dr. Levine's opinion was supported by Lee's water park expert Kent Lemasters who testified that it was not unusual for water parks to use their own employees to erect new slides, depending on the skills of park personnel and other issues.

As set forth above, the key communications, all indicate that American Specialty would agree to insure Lee's employees performing 'their designated classification as water park employees,' and Lee agreed that its employees

'would be restricted to park operations.' Taken together, and in light of Dr. Levine's uncontroverted testimony, it is clear that Ms. Conley (and Mr. Calomiris and the remaining Lee employees assembling the Red Wave Slide in February 1999) was performing within park operations and performing a task that is within a designated water park classification code.

Thus, even though classification codes are technically only used to calculate premiums, the clear weight of the evidence was that they were used by the parties in this case to designate and describe USF & G's claimed underwriting limitation and Lee's expected and anticipated scope of work by its employees. The clear weight of the evidence was that water park operations included erecting water slides, Lee's employees would perform those tasks, Lee expected to be insured for those tasks, and USF & G and American Specialty should have expected to insure those tasks. Accordingly, the clear weight of the evidence is that there was no misrepresentation concerning the nature and scope of Lee employees' work and that Ms. Conley was performing a task contemplated and accepted by USF & G.

Both USF & G and Aon assert that Lee's contention ignores all of the evidence at trial and all of the relevant legal issues. USF & G rejoins:

First, Lee ignores the clear and explicit language in its August 12, 1998 letter that Lee would no longer employ construction laborers and that any construction work would be performed by independent contractors. Although Lee would like to rephrase the language of that letter to state that Lee's employees would only perform construction work requiring a separate classification under the Uniform Statistical Reporting Plan of the WCIRB, the letter clearly did not so state. In determining the falsity of Lee's representations and its intentional concealment of its plans to use its own employees to finish construction of the water park slide, whether or not its employees fell within a workers [sic] compensation classification is irrelevant. Any alleged testimony by Levine that Conley's work fell within a water park operations classification thus also was irrelevant. Lee's contention that the clear weight of the evidence established the classification codes were used by the parties to designate USF & G's claimed underwriting limitation as to the expected and anticipated scope of work by its employees ... is absurd. No one, not even Ms. Ehrlich, testified to that effect. Second, Lee's representation that it would not perform construction work with its own employees was not limited to Conley. During trial, Bruce Calomiris testified that he utilized a ten-ton crane and reach forklifts to assemble the water park slide. Conley herself testified that she performed work, including bolting together portions of the slide while other workers were on manlifts 30 to 40 feet in the air, which clearly constitute construction.

Third, as even Lee admits ..., 'classification codes are technically only used to calculate premiums, ...' ... It thus was irrelevant as to whether the work of any construction worker, including Conley, fell within an amusement park classification. Lee represented that it would not use its own employees to perform construction work. It did not reference workers [sic] compensation classifications. In any event, USF & G's expert, Bennett Bibel, testified that under the WCIRB, *new construction* must always be separately classified ... Even Levine testified that new construction had to be separately classified.

Finally, Levine in fact did not testify specifically that Conley was performing

work that fell within a water park classification. However, he did provide his preposterous and unbelievable testimony that while construction of a six-story building constituted 'construction,' construction of a[new] six-story water slide did not and that while construction of a temporary structure over a college graduation ceremony was considered assembly and not construction, even though the USRP had a *construction* classification for tent erection. The weight of the evidence was that Levine's testimony was preposterous and unbelievable.

This is a reasonable interpretation of the trial testimony of Dr. Levine. His opinions on what constituted "construction" work were so unrealistic as to support a finding of bias in favor of his unorthodox view of the meaning of "construction" for the purpose of classification codes as opposed to use of the term to determine whether USF & G was willing to undertake insurance business with Lee, to justify the jury rejecting his opinions. No testimony was adduced that the conversations between Lee's and AIS's representatives ever identified or considered classification codes rather than the commonly understood meaning of construction activities or construction workers.

Lee's motion on this ground is DENIED.

Aon argues that Lee's contention that Ms. Conley was performing work within the scope of water park operations is irrelevant:

[T]here was evidence that (1) all of the parties understood American Specialty's concern to be any type of construction work performed by Lee's employees, and (2) Lee understood the August 12, 1998 letter to mean that Lee's employees would not perform such work.

Aon refers to the trial testimony of Lee's Christy Platt:

Q. . . . . If you look to the last sentence of the letter, and it says . . . , 'The coverage with [USF & G] has been issued on the premise that there will be no construction laborers employed by [Lee].'

Now, that was your understanding as well?

A. Correct.

Q. So in your dealings with Mr. Awtrey and Aon around the time of the August 12th letter . . . you understood that Mr. Awtrey was relaying to you . . . the new insurance company's concerns about water park employees doing construction, correct?

A. Yes.

Q. Okay. And you understood that the August 12th letter was intended to address those concerns, correct?

A. Correct.

Q. And you discussed the insurance company's concerns with Lisa Ehrlich, correct?

A. I'm sure I did.

(Testimony of Platt, Feb. 14, 2007, 16:3–21). Aon also refers to the trial testimony of Cathy Hacker:

Q. And do you recall what Stan said about potentially issuing a USF & G policy to American Specialty to The Island for Workers' Compensation insurance?

A. My recollection is that he would consider writing it only on the condition that we had verification that Splash Island employees no longer would perform any construction work.

(Testimony of Hacker, Feb. 2, 2007, 55:16–21) Aon contends that since the jury reasonably could conclude that Ms. Conley was performing construction work, the jury's verdict was not against the clear weight of the evidence.

Lee replies that the August 11 and August 12, 1998 letters make clear that USF

& G intended to cover any work done by Lee employees if properly classified within water park classification and that Lee clearly informed ASI that it intended its workers to perform normal water park operations. Lee refers to the August 11, 1998 letter (Ex. 833):

> Attached is a copy of The Island's workers' compensation loss runs. Bill, I think we have a problem. The loss runs seem to evidence an interchange of labor between the water park employees and the construction employees. Please review the type of losses that have occurred and help us understand how this fits with our understanding of the client/employee relationship. We would have anticipated training losses rather than construction losses.
>
> After seeing the loss runs, we are concerned. The loss runs seem to support Industrial Indemnity auditors' position. Please help me to prove to our underwriter the following:
>
> 1. *Island employees will not be performing tasks outside of their designated classification as water park employees;*
>
> 2. Construction has ceased at The Island and all construction laborers working for Rexford Development Corporation have moved to a different job site. Therefore, workers' compensation claims arising from construction will not be reported under Lee Investments workers' compensation policy. [Emphasis added]

Lee again contends that neither Kent LeMasters' testimony or Dr. Levine's testimony has been rebutted. Lee refers to Dr. Levine's trial testimony:

> Q. . . . Dr. Levine, I would like you to assume that in response to the underwriter's inquiry on the previous hypothetical that I gave to you, the prospective insured responded using the term or phrase 'construction laborers,' and

stated that the prospective insured would not employ construction laborers. In 1998, would that phrase have been generally understood in the insurance industry to have had a specialized meaning?

> . . .

> A. Yes.

> Q. Dr. Levine, I would ask you to assume the same facts, except the prospective insured has stated that the prospective insured will not to do [sic], 'construction.' In 1998, would that term have generally been understood in the insurance industry to have had a specialized meaning?

> A. Yes.

> Q. Now, I want you to further assume that the prospective insured stated that the insured would limit its activities to 'park operations.' In 1998, would such phraseology generally have been understood in the insurance industry to have had a specialized meaning?

> . . .

> THE WITNESS: When you said 'park operations,' you are talking about a water park?

> . . .

> Q. Any kind of park for hypothetical purposes, an amusement park,

> . . .

> THE WITNESS: I mean as opposed to a public park with grass in it?

> MR. JAMISON: Right.

> . . .

> THE WITNESS: Yes. That would have a—that would be understood in the insurance industry to have a particular meaning.

> . . .

> Q. And what meaning would it have?

> A. Well, once again, it would mean operations that are performed by a con-

tractor or by a construction company that was classified or for some other reason had to be classified under one of the several dozen of specific construction codes or—I'm using 'code' and 'classification' interchangeably.

Q. Okay. And earlier in this series of hypotheticals, I asked you about the phrase, quote, 'construction laborers,' and you indicated that it would have been generally understood in the insurance industry to have a specialized meaning. What would that meaning have been?

A. I would distinguish it from, say, maintenance workers, repair workers, general grounds workers. All of those kinds of people can do what might be considered in a lay sense or generic sense construction work, but that's not what it means in the Workers' Comp industry. And maybe an example of that, let's talk about a water park.

If the—one of the sections of a slide at the top, I don't know how high the things are, 70 feet or whatever they are, were to break and need to be welded. You could have a park maintenance employee go up or operate a crane or whatever was required, and disassemble this thing and load this heavy pipe to the ground and weld it and then reverse the process. That might sound like a construction activity if you just generally talked about construction.

But very clearly, it's a repair activity and 'repair', 'it doesn't matter how heavy duty it is, if it's repair, then in the Workers' Comp rules, the classification language and so on, that's included in whatever the basic nonconstruction classification is.

So construction laborers, to me, doesn't mean people who are doing maintenance repair and other kinds of activities that are in the regular classification. It means people that are doing specifically construction classification things, usually contractors, employees those do those sorts of things [sic].

. . .

Q. In other words, you have to look at the fact that it's being used in a Workers' Compensation insurance context; is that right?

A. Yes.

(Testimony of Levine, Feb. 14, 2007, 45:9–49:80). Lee contends that because Dr. Levine's testimony establishes that, in the context of Workers' Compensation insurance, the terms "construction" and "construction laborer" do not refer to incidental repair or maintenance that is construction-like work, that may be performed by a water park maintenance employee, Ms. Conley's work on the red wave slide in February 1999 was normal park operations and was covered and expected within water park classifications 9180 or 9016. This entire argument assumes the validity of Dr. Levine's opinions about and definition of construction. The jury could easily have found unintelligible, the above-quoted testimony of Dr. Levine, and rejected it as incredible.

All Lee's arguments are centered on factual disputes, most especially Lee's credibility. The jury was free to reject Dr. Levine's testimony which, in places, was nonsensical, biased and sufficiently arbitrary as to be of no help to the trier of fact.

Lee's motion on this ground is DENIED.

D. *Whether Lee Made a Misrepresentation to Aon, Intended to Induce the Reliance of Aon, Aon's Reliance and Causation.*

▮▮ Lee argues that there was no legally sufficient evidence for a reasonable jury to find Lee liable to Aon under the "tort of another" doctrine. In addition,

Lee asserts, Christy Platt's August 12, 1998 letter and all of Lisa Ehrlich's statements to Hugh Awtrey in response to his questions on August 12, 1998 were intended to be transmitted to ASI. Lee argues:

Lee did not intend to induce any reliance on the part of Aon on any representations by Lee and Aon did not in fact rely on any such representations. Instead, Aon on [August 12, 1998] was, with the exception noted below, only delivering communications between Lee and American Specialty. Since Aon was not the intended recipient of any alleged misrepresentations and did not itself rely on any such representations, there could be no claim for a misrepresentation to Aon or other breach of duty by Lee to Aon.

The exception referred to by Lee is Lee's acknowledgment that Aon, on August 12, 1998, took upon itself to draft for Lee the language that was to be sent to ASI. However, Lee contends, this was at Aon's initiative. In addition, Lee contends, Aon, in Mr. Awtrey's and Ms. Moore's August 27, 1998 letter (Ex. 841), of its own volition and for its own purposes, took it upon itself to advise Lee that the policy had been issued on the premise that no construction laborers would be employed by Lee. Lee asserts that Aon's own conduct, and not any breach of duty by Lee to Aon, resulted in Aon being sued by USF & G and ASI for indemnity and resulted in Aon's counterclaim against USF & G and ASI for indemnity. Lee argues that Aon cannot recover for the "tort of another" where Lee breached no duty as to Aon or Aon's own conduct necessitated its involvement in litigation, citing *Burger v. Kuimelis*, 325 F.Supp.2d 1026, 1041–1043 (N.D.Cal.2004).

Aon responds that Lee presents a wholly partisan, one-sided view of the evidence and ignores substantial trial testimony to the contrary. Aon asserts that the jury reasonably concluded that Lee intentional-ly made misrepresentations to Aon during the effort to replace Lee's workers' comp insurance policy through USF & G, and that those misrepresentations harmed Aon. Aon contends there was substantial evidence that Lee knew Aon was relying on the truth of Lee's statements in preparing the letter to ASI and that Lee intended Aon to so rely. Aon refers to Aon's cross-examination of Lisa Ehrlich:

Q. He [Hugh Awtrey] may have told you that whatever work—the insurance company wanted to know that whatever work was going to be done was going to be done by subcontractors and that Lee would obtain certificates of insurance?

A. Yes.

Q. He told you that?

A. That they wanted a letter regarding that work that was done would be done by subcontractors and that certificates of insurance would be obtained.

. . .

Q. Whatever work was going to be done was going to be done by subcontractors?

A. Let me see if I can remember. We talked about—we talked about the status of operations, and then he told me that they wanted a letter. I know we talked about the construction laborers, and then we did talk about, yes, construction work, and that it would be done by subcontractors, and certificates of insurance would be issued.

. . .

Q. Okay. And in fact, this letter was prepared and sent to Christy Platt by Mr. Awtrey, as far as you know, right?

A. It was prepared by Mr. Awtrey and she signed it and sent it back to him, I believe.

Q. Again, I think you testified that you talked to Christy Platt and told her that

Mr. Awtrey would be proposing some language for a letter, right?

A. That is correct, that is what he said, that he might want to do that.

Q. And that as long as the language in the letter was consistent with your discussion with Mr. Awtrey and with Ms. Platt, that Ms. Platt could go ahead and sign that letter?

A. That is correct.

(Trial testimony of L. Ehrlich, Feb. 9, 2007, 7:10–18; 7:22–8:4; 8:14–9:1). Aon also refers to Aon's cross-examination of Christy Platt:

Q. Okay. And you were clarifying that issue for Hugh, correct? If I could re-phrase.

In other words, if the concern at the time of the cancellation of the Industrial Indemnity policy was that there were some employees doing construction that were employed by the water park, you were helping Hugh and Joanne understand that maybe those employees were in fact under Rexford or some other company?

A. Correct.

. . .

Q. . . . . Do you recall that Mr. Awtrey was seeking your assistance in helping the second insurance company, USF & G, feel more comfortable about issuing an insurance policy in light of these construction concerns?

A. As it relates to who was doing that work.

Q. Right.

A. I believe that to be true, yes.

(Trial testimony of Platt, Feb. 14, 2007, 5:17–25; 6:17–23).

Aon further responds that Aon did not "take it on itself" to write the letter to ASI. Instead, Aon was acting prudently in responding to ASI's requirement that it receive a letter from Lee before issuing the policy. Lee had full knowledge of this requirement, referring to the testimony set forth above, and to the trial testimony of Cathy Hacker:

Q. And do you recall what Stan said about potentially issuing a USF & G policy to American Specialty to The Island for Workers' Compensation insurance?

A. My recollection is that they would consider writing it only on the condition that we had verification that Splash Island employees no longer would perform any construction work.

. . .

Q. Now, in the meeting, was there any discussion about whether the response to any inquiry by Aon had to come from the insured, the policy holder or prospective policy holder?

A. Yes, we were requiring that we receive a written response from the insured.

. . .

Q. Okay. Was there anything in that letter, as you read it, that states, 'American Specialty is requesting a written response'?

A. Yes.

Q. And where is that?

A. The second paragraph, the second—third sentence, says, 'Please help me prove to our underwriter the following: Number 1, Island employees will not be performing tasks outside of their designated classification as water park employees.'

So a proof would mean a response.

Q. All right. So you understood the sentence, 'Please help me to prove to our underwriter,' to be a request for a written response; is that correct?

A. A response, which, since we like to have things in writing in the insurance world so that we have documentation, but it specifically does not say 'written proof.'

(Trial testimony of Hacker, Feb. 2, 2007, 55:16–21, 71:17–21, 108:5–21).

Aon asserts that Lee's reliance on *Burger v. Kuimelis, supra,* to negate any breach of duty by Lee to Aon is misplaced because the Northern District ruled that "[t]he duty not to mislead is a duty that runs from counterdefendants [insureds] to Kumeilis [broker]." *Burger, supra,* 325 F.Supp.2d at 1044. Aon responds that Lee's argument that Aon's own conduct in drafting the letter necessitated its involvement in this litigation ignores the fact that Lee provided misinformation to Aon:

> Accordingly, just as the insureds in *Burger* lied to their broker to induce him to prepare a document used to defraud HUD, Lee provided misinformation to Aon knowing that the August 12 letter would be used to secure an insurance policy through USF & G/American Specialty.

In its reply brief, Lee completely changes its position. Lee now argues:

> Dr. Levine's testimony was unrebutted that insurance industry personnel would be expected to understand 'construction,' as used in the terminology between the parties, not to include construction activities that were a part of water park maintenance within the meaning of water park classification codes 9016 and 9180, and to include only 'construction' activities that were outside of a water park classification and that would require a workers' compensation construction classification code. Ms. Platt testified by deposition to her understanding of the terminology as referring to 'ground-up' construction of the park. Mr. Awtrey was both in the insurance industry and had worked for years at Clovis Lakes, later known as Wild Waters Adventures, where park employees built slides. Mr. Awtrey admitted that he never discussed construction of water slide [sic] with Lee. (2/8/07

Awtrey testimony at 126:13–128:4.) There was no evidence that Mr. Awtrey, Cathy Hacker or anyone else in the insurance industry conveyed to Lee that they interpreted 'construction' differently than Dr. Levine testified they would have been expected to interpret it.

Lee (and Aon . . .) could reasonably (and did by Dr. Levine's and Ms. Platt's deposition testimony) have understood that completion of the red slide was not 'construction' within the meaning of Mr. Sackett's August 11, 1998 letter and Ms. Platt's August 12, 1998 letter (and Mr. Awtrey's and Ms. Moore [sic] August 27, 1998 letter to Lee), but instead would be considered activity within a water park classification. There was no misrepresentation if the completion of the red slide was such activity. Uncontradicted expert evidence from Mr. Lemasters established that it was not unusual for water parks to do slide erection with their own maintenance employees and Dr. Levine's testimony that such work would fall within a water park classification was uncontradicted. USF & G's citation to the testimony of both Mr. Bibel and Dr. Levine that 'new construction' would be separately classified begged the question about how to classify the completion of the red slide. Aon cites no testimony indicating that any expert other than Dr. Levine answered this question.

Furthermore, by the time USF & G filed its Master Unit Statistical Report designation of the Conley accident as falling within classification code 9016, USF & G has already filed its rescission action. Dr. Levine testified that USF & G could and should have sought to change how it designated the accident, but never did. Accordingly, USF & G's Master Unit Statistical Report was contrary to its contention in its rescission action and stands, along with Dr. Le-

vine's testimony, as unrebutted evidence that Conley's accident arose from activity within a water park classification.

Accordingly, there was no evidence to support that Lee made a misrepresentation to Aon, that Lee intended to induce Aon to rely on a misrepresentation, or that Aon actually relied on a misrepresentation. Furthermore, if Aon had relied on Ms. Platt's August 12, 1998 letter to mean that Lee could not complete the red slide, that reliance, as a matter of law and uncontradicted evidence, would have been unjustified.

All these contentions have been discussed. They represent Lee's view of the evidence, ignoring the alternative decisions the jury reached. Once Lee sought replacement coverage, the insurer willing to write new coverage, USF & G, would not do so unless Lee agreed in writing not to engage in further construction activities and to have third party contractors perform any construction work. The insurer USF & G, through American Specialty, required such written representation, undertaking and commitment from Lee. Once it made such representations, Lee had a duty to speak truthfully. Its failure to be honest and forthright caused its insurance broker, Aon, to be sued. Absent Lee's wrongful conduct in misrepresenting material facts (fraud), Aon would not have been sued by USF & G, requiring Aon to expend attorneys' fees in its defense.

Lee's motion on Aon's tort of another claim is DENIED, subject to allocation of recoverable fees for tort of another where the direct claims and defenses between the Lee parties and Aon do not implicate USF & G's indemnity case.

E. *Amendment of Partial Judgment to Require USF & G To Return All Premiums Paid by Lee.*

Lee, citing California Civil Code § 1691(b), contends that, before rescission can be effected, USF & G is required to restore all premiums, plus interest, paid by Lee for the policy. Lee, refers to Exhibit Nos. 411, JX84, JX84.003–008, and asserts that the amount of the principal is $38,554. Lee argues that the Partial Judgment should be amended to read that USF & G shall pay Lee $38,554 plus interest. USF & G does not argue this is not the law.

This is an issue that will be resolved in the Findings of Fact and Conclusions of Law that will be issued in connection with the Hearing re Remaining Damages conducted on April 4–5, 2007. Because those Findings of Fact and Conclusions of Law have not yet been issued, Lee's motion to amend the Partial Judgment in this regard is premature.

F. *Partial Judgment's References to FRCP 55(b).*

This reference to Fed. R. Civ. Proc. 55(b) was a typographical error. Lee's motion to amend the Partial Judgment to reflect that it was entered pursuant to Rule 54(b), Federal Rules of Civil Procedure, is well-taken and is GRANTED *nunc pro tunc.*

G. *Whether The Partial Judgment Erroneously States Lee Has Stipulated to Certain Matters.*

The Partial Judgment (Doc. 681) states in pertinent part:

The parties have reserved, by written stipulation and order: USF & G's alter ego claims against Richard K. Ehrlich, an individual, et al. . . . Any claims as to Diana Conley have been determined by the parties' stipulation.

Lee contends that it has not stipulated to the inclusion of the alter ego claims against Richard Ehrlich, but acknowledges that USF & G was allowed to amend its Complaint to add alter ego allegations and trial of these claims were severed by Or-

der filed on July 18, 2006, (Doc. 256, pp. 12–16), and by Order filed on December 12, 2006. (Doc. 395, p. 3). Lee contends that the Partial Judgment should be amended to reflect this background.

USF & G responds that whether Lee stipulated to this or not is irrelevant.

The Partial Judgment should reflect correctly the positions of the parties. Therefore, this aspect of Lee's motion is GRANTED.

With regard to Diana Conley, Lee asserts that it has not stipulated to any determination of claims as to Diana Conley, noting that the Stipulation by which Ms. Conley was dismissed from this action was signed only by Ms. Conley's counsel and counsel for USF & G. Therefore, Lee moves for amendment of the Partial Judgment to reflect this.

USF & G responds that Lee's position is irrelevant because Lee never asserted a claim against Ms. Conley.

The Partial Judgment should correctly reflect all parties' positions. Lee's motion to amend the Partial Judgment in these respects is GRANTED.

H. *Partial Judgment's Failure to Include as Issues Remaining for Further Trial (a) Whether USF & G is Entitled to Any Restitution, and (b) USF & G's Duty to Defend Lee in the WCAB Proceedings and In This Action.*

a. *Restitution Award is Premature.*

Lee contends that entry of Partial Judgment in favor of USF & G and against Lee for restitutionary damages of $875,034.99 is premature. Lee contends that the Partial Judgment fails to list as reserved issues all of those issues. Lee refers to the Stipulation and Order Regarding Issues to Be Determined by the Court, (Doc. 682) filed by the Court on either February 27, 2007 or March 1, 2007 (both dates are listed), wherein the parties stipulated, in pertinent part, that the Court will hear and decide the following issues:

3. Whether USF & G is entitled to restitution of any amount in light of Aon and Lee's contention that USF & G did not actually incur the costs or expenses associated with Ms. Conley's injury (i.e., whether USF & G is the real party in interest);

4. The amount, if any, of restitution that USF & G is entitled to recover from Lee for fees, costs and expenses paid allegedly to defend Lee in the Workers' Compensation proceeding (and whether USF & G is the real party in interest in relation to this restitution).

Lee also refers to the Stipulation re Handling of Claims for Attorneys Fees and Litigation Expenses, (Doc. 654), filed on either February 21, 2007 or February 23, 2007 (both dates are listed):

2. It is further stipulated and agreed that if restitution of USF & G's alleged attorney fees and expenses is awarded in the pending phase of the trial, and if Lee is otherwise entitled to recover from USF & G for breach of the duty to defend, Lee may seek to recover back from USF & G the attorney fees and litigation expenses in the trial phase of this action that will address breach of the duty to defend.

3. It is further stipulated and agreed that in the pending phase of the trial, the jury will address only the respective liabilities, if any, of Lee to USF & G, of the other parties to the pending phase to Lee, and of Lee to Aon, including the basis, if any, for punitive damages sought by Lee, and will not address any party's damages in the pending phase except that if rescission of the subject USF & G insurance contract is awarded, the jury shall address the amount of USF & G's restitution, if any, unless

such amount is to be determined by the Court.

Lee contends that these stipulations and orders make the award of restitution to USF & G premature:

> [I]t remains for USF & G to demonstrate that it actually incurred the costs and expenses associated with Ms. Conley's injuries and that it is the real party in interest with respect to those amounts and with respect to the attorney fees and expenses paid to Lee. Accordingly, none of the monetary amount of $875,034.99 in the Partial Judgment should at this time be awarded pending USF & G's proof that it incurred and paid the amounts and is the real party in interest.
>
> Although USF & G will argue that at least the amount of $623,320.09 should be awarded because of the ruling of Judge Coyle on the cross-motions for summary judgment, this argument should be rejected. In case the jury did not award an amount satisfactory to USF & G, USF & G consciously elected to stipulate that the Court would try the amount of restitution and cannot now be heard to claim that the $623,320.09 was already determined as paid by USF & G. In all events, USF & G must prove that it paid and is the real party in interest regarding (a) the $251,714.90 paid to Ms. Conley for the period May 2002 to the present, and (b) the amount claimed for attorney fees and litigation expenses paid to Lee.

Lee therefore contends that the Partial Judgment should be vacated pending the Court's determination of the amount of restitution, if any, to which USF & G is entitled.

As USF & G asserts, the Court has already determined by summary judgment that USF & G is entitled to restitution of $623,320.09. The Pretrial Order (Final Form), (Doc. 700), sets forth as Undisputed Fact No. 37 that USF & G paid $623,320.09 to or on behalf of Ms. Conley. The jury found that USF & G is entitled to an additional among of $251,714.19 paid to or on behalf of Diana Conley for the period May 2002 to the present.

In reply, Lee acknowledges the hearing on April 4–5, 2007 and contends that the Partial Judgment will need to be amended to conform to the judgment yet to be made by the court.

Lee's motion on this ground is DENIED.

b. *Whether USF & G Breached the Duty to Defend Remains for Separate Trial.*

Whether or not the Court awards restitution to USF & G for the attorney fees and expenses paid to Lee, Lee contends that the issue of whether USF & G breached the duty to defend in the WCAB proceedings and in this action remains to be tried before a separate jury.

USF & G responds that Lee's contention is frivolous because Lee can claim no breach of any duty to defend under the policy because, as a matter of law following rescission, and under the Partial Judgment, no contract ever existed between Lee and USF & G.

Lee responds that this issue is not properly before the court, except to correct any possible suggestion in the Partial Judgment as written that this issue is not among those remaining to be tried in a separate trial.

Because any issue of USF & G's breach of a duty to defend Lee is not presently at issue and was reserved for trial in a later proceeding, Lee's motion to amend the Partial Judgment on this ground is GRANTED.

## CONCLUSION

For all the reasons stated above, the following orders are entered:

1. Lee's motion that the Partial Judgment is void and/or that Lee is entitled to judgment as a matter of law because the WCAB had and has exclusive jurisdiction is DENIED;

2. Lee's motion that it is entitled to judgment as a matter of law because California law requires any limitation on a worker's compensation policy be by an approved form of endorsement is DENIED;

3. Lee's motion that Mr. Sackett's August 11, 1998 letter imposed a condition or restriction on coverage is DENIED;

4. Lee's motion that Christy Platt's August 12, 1998 letter to Mr. Sackett and related communications should have been excluded from evidence under the parol evidence rule is DENIED;

5. Lee's Motion that an application for the subject insurance was required is DENIED;

6. Lee's motion that USF & G failed to show Lee's employees engaged in activities outside of a water park classification is DENIED;

7. Lee's motion that there was no legally sufficient evidence for a reasonable jury to find Lee liable to Aon for the "tort of another" is DENIED;

8. Lee's motion to amend the Partial Judgment to require USF & G to return all premiums paid by Lee is DENIED as premature;

9. Lee's motion to amend the Partial Judgment to refer to Rule 54(b), Federal Rules of Civil Procedure, rather than Rule 55(b), Federal Rules of Civil Procedure, is GRANTED *nunc pro tunc;*

10. Lee's motion to amend the Partial Judgment to reflect that Lee did not stipulate to certain matters is GRANTED *nunc pro tunc;*

11. Lee's motion to amend the Partial Judgment because it fails to include as issues remaining for further trial (a) whether USF & G is entitled to any restitution and (b) USF & G's duty to defend Lee in the WCAB proceedings and in this action is DENIED IN PART AND GRANTED IN PART.

12. Counsel for USF & G and Aon shall prepare and lodge a form of order that reflects the specific rulings on each issue addressed by this decision within five (5) days following the date of service of this decision by the Court's Clerk.

IT IS SO ORDERED.